City of Philadelphia, Appellant, *v.* James McManes, David W. Sellers, Wm. M. Singerly, A. Loudon Snowden, P. A. B. Widener, John R. Fell, Charles W. Henry, A. J. Cassatt, Wm. S. Stokley, Samuel G. Thompson, Charles F. Warwick, James L. Miles, Wencel Hartman, George S. Webster, A. S. Eisenhower and John C. Trautwine, Jr., Commissioners of Fairmount Park, William Wharton, Jr., and The Fairmount Transportation Company.

*Street railways—Municipalities—Construction of railway in Fairmount Park.*

The commissioners of Fairmount Park in the city of Philadelphia have the power to grant to an individual or a foreign corporation the franchise or power to construct a passenger railway in Fairmount Park, and such franchise may be exercised without the consent of the city councils.

Argued March 26, 1896. Appeal, No. 16, Jan. T., 1896, by plaintiff, from decree of C. P. No. 4, Phila. Co., June T., 1895, No. 714, dismissing bill in equity. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ. Affirmed.

Bill in equity for an injunction to restrain the construction of a passenger railway on Fairmount Park.

THAYER, P. J., filed the following opinion:

A bill has been brought in this court in the name of the city of Philadelphia and by the direction of city councils, against the commissioners of Fairmount Park and others, to enjoin the building of a passenger railway within the confines of the park. This road is proposed to be constructed, not by the commissioners themselves, but under a license granted by the commissioners to William Wharton, Jr., July 24, 1889, to construct the same, in the manner and upon the terms and conditions specially set forth and declared in an agreement of that date, and certain amendments thereto subsequently adopted in 1894. This agreement has been so far executed on the part of Mr.

Wharton that he has paid to the commissioners the sum of $9,924, as stipulated in the eighth amendment of the original agreement, which sum represented the amount expended by the commissioners in the construction of the bridge approaches and drive provided for in art. XII. of the license. Subsequently the license granted by the commissioners to Mr. Wharton was, with the consent of the board, expressed in a formal resolution, assigned by Mr. Wharton to the Fairmount Park Transportation Company, the cost of constructing the railway and the bridge to carry it over the Schuylkill river (estimated at over a million of dollars) having been doubtless found to be too heavy a burden to be borne by a single individual.

The proposed railway is to be about six miles in length. Starting from a point on Belmont avenue at the southern extremity of the park, it passes along its western boundary, pursuing a northerly course, and skirting along said boundary to a point north of Chamounix, thence returning southerly to a point opposite Strawberry mansion, where it will cross the Schuylkill by a substantial and ornamental bridge of steel and iron, which will be free to the public, and furnish a convenient and much needed means of crossing the river at that point. Proceeding thence, its eastern terminus will be at the intersection of Thirty-third street and Dauphin street. From the western end of the bridge a branch will traverse the park to a point where it will intersect the track on the western boundary of the park at its junction with Belmont avenue. This route avoids the principal park drives. It will not occupy any drive longitudinally, nor cross any drive whatever at grade. In most instances it will pass at points where the movement of the cars will scarcely be seen from any drive or road. These facts were agreed to upon the argument by both parties, the statements to the contrary, contained in the bill as originally filed, being candidly admitted by the plaintiff's counsel to be erroneous, and being upon their motion stricken out of the bill.

The object of the commissioners in granting the license appears by their answer to be to enable people who do not own and cannot afford to hire carriages to visit with ease the remoter parts of the park, from which they have hitherto been shut out and excluded by the distance to be traveled. They declare that at present people of small or moderate means are prevented

from enjoying the most beautiful portions of the park by their inability to reach them. The object of the proposed road is to enable them to do so, an object which most people will concede to be a laudable one. Fairmount Park is not only the pride of the city, but the great recreation ground of its people. In the way of physical beauty the city has little else to be proud of. Her streets are narrow, treeless, dusty, unattractive and disfigured everywhere with unsightly poles and structures. Her great park, the largest and finest in the United States, extending for ten miles through the most diversified scenery, with a beautiful river flowing through its midst, is justly her boast and her chief treasure. If the facilities for its enjoyment by the toiling thousands who labor in her workshops, her mills, her forges, her great factories and houses of industry, can be enlarged and increased by the means proposed by the commissioners without detracting from its beauty or impairing its present advantages and attractions, few will be found probably to object to it.

But the question of the expediency of building such a road is not before us in this case, and we have no concern with it. There will naturally be some difference of opinion on that subject. The question which we have to decide, however, is a different one. It is whether the commissioners have the power to grant this license. That is a question of law, and that is the only question we have to determine. If the commissioners have the power to grant the license the expediency of it belongs to them, and to them alone. If they have the power, the discretion which accompanies it is theirs also, and neither this court nor any one else can interfere with it, or deprive them of it.

Whoever will read attentively the four acts of assembly organizing Fairmount Park, and regulating its affairs and government—the acts of 1867, 1868, 1869 and 1870—will have no difficulty in perceiving that while the largest powers are granted by the legislature to the commissioners designated by the state to govern and control it, the city councils are carefully excluded from all participation in the control of its affairs. At the same time it is obvious that the interests of the city of Philadelphia in the park were remembered and adequately protected by giving the city six representatives in the board of commissioners.

The second section of the original act of March 26, 1867, requires the mayor, the presidents of select and common councils, the chief engineer and surveyor of the city, the commissioner of city property, and the chief engineer of the water works, to be members of the board, who act in unison with ten citizens of Philadelphia, appointed by the judges of the courts.   Thus more than one third of the entire board consists of city officials, and this accounts for the somewhat anomalous fact that in the present suit, brought by direction of the city councils in the corporate name of the city, six of the defendants are chief executive officers of the city itself, including its chief magistrate, the mayor of the city.   By the terms of the act of 1867, the legal title to the ground is also vested in the city, and the place is to be forever maintained " as a public place and park for the health and enjoyment of the people of said city, and the preservation of the water supply of the city of Philadelphia."   The use thus declared was somewhat enlarged by the act of March 16, 1870, the first section of which requires the city to maintain and keep open the park "for the free use and enjoyment of all the citizens of this state."

The act of 1867 committed the entire and exclusive control and maintenance of the park to the commissioners, and while placing the city councils under obligations to make the necessary appropriations for its maintenance, excluded them from all power over the plans and expenditures, carefully requiring, in the most explicit terms, that all such plans and expenditures should be under the control of the commissioners (section 5).

The act of April 14, 1868, greatly extended and enlarged the general powers given to the park commissioners by the preceding acts.   The act of 1868, which consisted of as many as twenty-eight sections, dealt with a great variety of subjects relating to the park.   It gave the commissioners power to vacate all existing streets in the park, excepting Girard avenue. It extended their jurisdiction to the footways adjoining the park.   It required the city, from time to time, to raise by loans such sums as should be necessary " for the permanent care and improvement of the park," and to assess taxes annually for its repair and improvement.   It gave to the commissioners the exclusive appointment of all park officers and agents, with the

exclusive right to prescribe their several duties and the compensation to be paid to them. It gave them further complete control of all houses and buildings in the park. It established a code of regulations for the park, and gave the commissioners power to add to them from time to time at their discretion, and (what is more germane and important to the present case) it expressly gave the commissioners power "to construct all proper bridges, buildings, railways and other improvements therein." The twentieth section gave the commissioners, in express terms, "authority to license the laying down and the use for a term of years, from time to time, such passenger railways as they think will comport with the use and enjoyment of the said park by the public, upon such terms as such commissioners may agree to."

In all this large grant of powers the only power given to the city councils was a power which they already possessed, viz: the power to widen and straighten any street for the purpose of improving the approaches to the park (section 24). All other powers were scrupulously and studiously withheld from them by the state. If they have at any time exercised any such powers through the control which the law gives them over appropriations or otherwise, it is a usurpation of authority unwarranted by law, and against which the courts of justice would be obliged to enjoin them peremptorily, if relief against it were sought there.

Every one must see that, in the language which I have above quoted from the act of 1868, authority is given to the commissioners, in terms so express and unambiguous as not to admit of any denial or doubt, to do the very thing which the city councils complain of in the present bill. This was very frankly admitted upon the argument by the very learned and able counsel who argued the case on behalf of the plaintiff. It was very plain to them, as it must be to every one, that the act of 1868 makes an end of all controversy relative to the right of the commissioners to grant the license complained of in this bill, unless the act of 1868 can be gotten rid of. The plaintiff's counsel, therefore, meeting with a decisive repulse at this point, fell back upon the position that the act of 1868 is, so far as regards this particular grant of authority, unconstitutional and invalid, because, as they say, it violates the

provision contained in art. XVII. § 9, of the constitution, which declares that "no street passenger railway shall be constructed within the limits of any city, borough or township without the consent of its local authorities." It is argued that the proposed railway in the park is a street railway within the meaning of the constitution, and that it cannot therefore be built without the consent of the local authorities, which, it is contended, are the city councils, and that, consequently, any authority given by the legislature to the commissioners to build such a road in the park, without the consent of the city councils first obtained thereto, is in violation of the constitution, void, and of no effect.

But this position is wholly untenable, and arises out of a mistaken interpretation and confusion of terms. What is prohibited by the constitution is the building of street passenger railways in cities and boroughs without the consent of the local authorities. A passenger railway in Fairmount Park, where there are no streets but only country roads is not a street passenger railway, and does not offend against the constitution in any respect. This is plain, not only from the terms used in the constitution, but equally so from the reason of the thing. A street railway, ex vi termini, imports a railway in a street, whether it be propelled by horses or electricity, and has no relation to a passenger railway in Fairmount Park. Such a railway is neither within the terms nor the meaning of the constitutional provision, neither is it within the mischief intended to be guarded against by the constitution. The railway in the park, contemplated in the license given by the commissioners, is a passenger railway undoubtedly, but not a street passenger railway, and cannot be brought within the meaning of such terms by any fair reasoning, or by any canons of construction with which I am familiar. The distinction between a street passenger railway and other passenger railways must be plain enough for any one's comprehension. It is a distinction clearly recognized by the legislature itself in the act of 1868 now under discussion. The twenty-first section of the act expressly prohibits the coming of any "street railroad car" within the lines of the park without a license from the commissioners. The twentieth section authorizes the commissioners to license the laying down of "passenger railways in the park."

We entertain no doubt, therefore, that the express authority given to the park commissioners by the act of 1868 to license a passenger railway in Fairmount Park without the consent of the city councils is entirely free from any constitutional or other objection. We are clearly of the opinion that they have an undoubted right to grant such a license, and we are equally clear that the city councils of Philadelphia have not the least pretense of authority to interfere with the exercise of that right in any manner whatever. The commissioners derive their authority from a higher source than the city councils. They were not created by them, are not their agents in any sense, and are not in any way subject to their authority or control. They were appointed under the authority of the state, which has confided to them, and to them alone, the control and management of the park, which they are to govern and manage alone, without any interference on the part of councils, for the benefit of all citizens of Philadelphia, and, according to the words of the act of 1870, " for the free use and enjoyment of all the citizens of this state."

But even if it were conceded that the constitutional provision referred to extended to other passenger railways besides street passenger railways, it might well be contended, so far as the present case is concerned, that the commissioners of Fairmount Park constitute in this case the "local authorities" referred to, and come within the definition of those words in the constitution, inasmuch as they are the persons to whom alone all authority and control over the park are given by law. But the case of the defendants is so strong upon other grounds that it is altogether unnecessary to resort to this argument.

The law imposes upon the city councils the obligation of raising sufficient and adequate sums of money, by loans and taxes, for the maintenance and improvement of the park. It gives them no authority whatever to control expenditures of money appropriated by them for park purposes in pursuance of the duty imposed upon them by law, or to interfere therewith in any manner whatever. On the contrary, it excludes by express words all such interference. By section 5 of the act of 1867, " all moneys expended shall be under the supervision of the commissioners," and they alone are to control " all expenditures and all plans for the maintenance and improvement of

the park." It thus appears that the entire and exclusive control of the park, its grounds, its works, its maintenance, its improvement, its expenditures, its business, its officers and employees together with every function of government relating to the subject, has been confided by the legislature to the park commissioners, consisting of sixteen persons, of whom six are official representatives of the interests of the city and ten are reputable citizens of Philadelphia, appointed under the authority of the state by the judges of the courts of common pleas. It further appears that, beyond a doubt, this body has express authority to grant the license complained of in this case, and that such grant of authority is not obnoxious to any constitutional objection, and further, that by the very terms of the grant it is in no manner whatever dependent upon the will of the city councils, nor have the latter any voice or authority whatever to intermeddle in the matter. I may further say that it is upon record in this case that the act of 1868, which is the chief source from which these great powers flow, was formally approved by the city councils of Philadelphia before its passage by the legislature, in an ordinance passed by councils, March 4, 1868, wherein the legislature was requested to pass the said act. This does not amount, of course, to an estoppel, but it shows conclusively that the councils of that day were fully satisfied with the powers granted to the commissioners, and that they not only approved, but begged for the passage of the act which the present councils, now endeavor to pick to pieces and overthrow. Laws, however, are the decrees of the governing power in a state. They remain in force until they are changed by the power which enacted them. They do not alter with the caprices and changes of opinion which take place in individuals, or in subordinate bodies which are equally subject to the law with individuals.

It was further objected that the defendants, in the agreement of license entered into with William Wharton, Jr., have not provided that all emoluments derived from the license shall be paid into the city treasury, in pursuance of the 20th and 23d sections of the act of 1868. Section 23, while it requires all license charges to be paid into the city treasury, also provides that all such funds are to be appropriated by councils to park purposes under the direction of the park commission, so that

paying these funds into the city treasury amounts only to this, that after they are paid in they are to be drawn out again by the commissioners and appropriated exclusively to park purposes. But it is a decisive answer to the objection, that no pecuniary emoluments whatever are reserved in the license, but compensation of altogether another kind, the licensee being required and covenanting, in lieu of other emoluments, to make such improvements annually in the park as the commission shall direct, at his own expense, provided such expense shall not exceed annually more than two per cent of the gross receipts from fares of passengers. This, with the expenses attending the building and equipping of the road, and of the bridge over the Schuylkill, which are to be borne exclusively by the lessee, together with the public convenience afforded by the road, constitute the consideration for the contract entered into between the licensee and the commissioners. There are therefore no emoluments to be paid into the city treasury, and if there were they would return immediately to the commissioners, to be expended by them in the very improvements which the licensee is bound under the agreement to make. That the commissioners were authorized to make the contract in this form there can be no doubt, for by section 20 of the act of 1868 they were empowered to grant the license "upon such terms as they might see proper." This objection therefore falls to the ground.

Finally, it was argued that the commissioners had no authority to approve the transfer of the license, granted to Mr. Wharton, to the Fairmount Park Transportation Company, because that company is organized under a charter obtained in the state of New Jersey. The work of building the railway and bridge will be attended by a very great outlay of money, estimated at considerably more than a million of dollars. Such works can ordinarily be undertaken only by combined capital, and it is not surprising that the load should have proved too heavy for a single individual to carry, and that Mr. Wharton was compelled to resort to the formation of a company to raise the necessary capital. There are general laws of the state of Pennsylvania authorizing the formation of incorporated companies for the building of railroads, and of street passenger railways, but I am not aware of any general law in this state authorizing the incorporation of a company for such a purpose as the building

of a passenger railway in Fairmount Park. In this dilemma resort was had to a New Jersey charter, and a company was accordingly incorporated under such a charter. There is nothing in the act of 1868, or any other law, which would have prevented the park commission from granting the license originally to the Fairmount Park Transportation Company, and if they could have done so they have an undoubted right to approve of the transfer to that company made by their licensee, Mr. Wharton. This they have done. Under existing laws no foreign corporation has a right to carry on business in this state without complying with the laws of this state upon that subject. There is no evidence before us that this company does not intend to do that. The presumption is that they will comply with the provisions of all such laws. If they should not, it will be a matter for the state to look into and redress. The city has little or no concern with that. This company has no right of eminent domain, and no right to build a railway anywhere, without the consent of those who have the authority to give it. They can intrude upon no man's land, nor take any man's property. They do not usurp any prerogative of the state, nor have they seized upon any franchise. They are a corporation engaged in the business of carrying passengers in the park under a license which they have virtually obtained from the commissioners, and through them from the state of Pennsylvania itself, for the state, in giving the authority to the commissioners to grant the license, imposed no limitations or restrictions whatever upon the exercise of that authority, and I know of no law which will prevent the company from exercising the license if they comply in good faith with the laws regulating the transaction of business in this state by foreign corporations.

Upon the whole case we are of opinion that the bill filed in this case has no valid foundations upon which to rest, and that no reason exists which would justify us in interfering with the prosecution of the work upon the proposed passenger railway in Fairmount Park, a work which has been projected and undertaken in pursuance of law, and for the construction of which the promoters of the enterprise have the authority of the commissioners and the express warrant of the legislature. I may add, that a careful examination of the contract upon which the license is founded shows that great pains have been taken to

protect the public interests in every particular. This case was originally set down for argument upon a motion for a preliminary injunction, but upon the argument it was agreed by the counsel for the respective parties that it should be heard upon bill and answer and a final decree made by the court.

It is therefore now ordered and decreed that the bill filed in this case be dismissed, and that the plaintiff pay the costs of suit.

*Error assigned* was decree dismissing bill.

*James Alcorn*, assistant city solicitor, *John L. Kinsey*, city solicitor, with him, for appellant.—The commissioners of Fairmount Park cannot grant to an individual or a foreign corporation the franchise or power to construct a passenger railway in Fairmount Park: Act of April 14, 1868, P. L. 1088; Constitution of 1874, sec. 9, art. XVII.

Neither an individual nor a foreign corporation without a franchise or license from the state of Pennsylvania has any authority to construct and operate a passenger railway within the state; 1 Wood on Railroads, 27; 1 Redfield on Railways, 94; New York & Erie R. R. v. Young, 33 Pa. 175; Com. v. Bowman, 3 Pa. 202; Potts v. R. R., 161 Pa. 396; Com. v. Park, 10 Phila. 445; City v. Germantown Pass. Ry., 10 Phila. 165.

Section 20 of the act of April 14, 1868, is in violation of article XI. section 8, of the constitution of 1838, if it authorizes the commissioners of Fairmount Park to confer on an individual or corporation, a franchise to construct and operate a passenger railway in the said park: Phila. v. Spring Garden Market Co., 161 Pa. 522; Phila. v. Ridge Av. Pass. R. R., 142 Pa. 484.

The license as granted is invalid, because the emoluments therefrom are not required to be paid into the city treasury: Act of April 14, 1868, sec. 20.

The act of March 16, 1870, P. L. 451, prohibits the construction of a railroad within the limits of Fairmount Park: Rafferty v. Central Traction Co., 147 Pa. 579; Hestonville, Mantua & Fairmount Pass. R. v. City, 89 Pa. 210.

A passenger railway in Fairmount Park cannot be constructed

without the consent of councils: Philadelphia v. Collins, 68 Pa. 106; Shunk v. Navigation Co., 14 S. & R. 71; City v. Gilmartin, 71 Pa. 140; Reeves v. Philadelphia Traction Co., 152 Pa. 153.

*Rufus E. Shapley, John G. Johnson* and *Samuel C. Perkins* with him, for appellees.—No consent of councils is necessary.

Even if the constitutional provision applies to this case, the consent of the city which said provision contemplates has already been given to the licensee by the only department of the city government which has any control over railways in the park: Phila. v. Germantown Pass. Ry., 10 Phila. 165.

The powers claimed by the commissioners were confirmed by decisions of the courts in 1874, and have been at all times faithfully exercised.

Per Curiam, April 6, 1896:

We find nothing in this record to justify a reversal or modification of the decree dismissing the bill at plaintiff's costs. The questions involved—so far as they are at all material—were carefully considered and correctly decided by the court below. All that can be profitably said in relation to either of them will be found in the clear, concise and exhaustive opinion of its learned president. On that opinion, the decree is affirmed and appeal dismissed with costs to be paid by the plaintiff.