# South & North Alabama Railroad Co. v. Highland Avenue & Belt Railroad Co.

*Bill in Equity for Specific Performance.*

1. *Eminent domain; may be exercised over the right of way of another company, &c.*—A corporation having the authority under its charter to construct a belt railroad for transferring freight cars, has the right in the construction of its road, upon making just compensation, to intersect, connect with, or cross any other railroad, and also the right to take a portion of the right of way of another railroad company, upon showing a reasonable necessity therefor, and that such taking would not destroy the usefulness of the right of way as a franchise, or so impair the capacity of the easement as to

render it unsafe. Both these rights may be enforced by statutory proceedings for this purpose.

2. *Corporation cannot condemn lands for purpose not authorized by its charter.*—A corporation without authority under its charter to construct a railroad, has no power to receive and hold, either by grant or condemnation, land for the use of such railroad, and cannot, therefore, by resorting to statutory proceedings, condemn crossings over the right of way of another railroad company, or the use of part of such right of way.

3. *Right to construct street railway gives no authority to construct belt railway for transferring freight.*—The power of a corporation by its charter to construct a street railway, propelled by horse, steam, or other motive power, gives no authority to construct a belt railroad in and around the city, for the sole purpose of transferring freight cars to and from factories and other railroads, nor right to take or receive, either by condemnation or grant, property for the use of such belt railroad.

4. *State alone can question right of corporation to hold lands once acquired.*—If a corporation has acquired the title and possession of real property, its right to hold it cannot be questioned by a private citizen; the question is one between the corporation and the government; the State alone can question the right in a direct proceeding for the purpose.

5. *Equity will not perfect title which corporation not authorized to hold.*—If it is necessary for a corporation to seek the aid of a court of equity to perfect its title to property, an interested individual may contest its claim thereto, and the court will, in case it has no right to hold property of the particular kind in controversy, refuse a decree in its favor.

6. *Grantee of lands held by the grantor under executory contract, succeeds only to the grantor's rights;* and acquires no higher right to seek the aid of a court of equity to perfect his title to, or to obtain possession of the property, unless the original vendor has recognized, or in some way estopped himself to deny the rights of the grantee under the agreement.

7. *Discretion in granting specific performance.*—In granting or withholding of a decree of specific performance the court is invested with a discretion, not arbitrary or capricious, but a sound judicial discretion, controlled by fixed rules and principles. It moulds and tempers its action or refusal to act according to the special features and incidents of each case, and from them determines whether the conscience of the party charged with a violation of the contract is so affected that moral and equitable duty compel him to a strict performance, rather than to a payment of such damages as a court of law would award against him. The court will examine the contract, and the circumstances attending its execution,

[South & North Ala. R. R. Co. v. Highlana Ave. & Belt R. R. Co.]

to ascertain what in truth was the real intention of the parties, and carry that intention into effect; or if it cannot be carried into effect, leave the parties to their legal remedies. In every case, the question must be whether the exercise of the power of the court is demanded to subserve the ends of justice, and unless the court is satisfied it is right in every respect, it refuses to interfere.

8. *Mutuality of obligation and remedy.*—There must be in the contract mutuality of obligation and equitable remedy for its enforcement. Where a contract in its nature and character, and according to the intention of the parties, involves and imposes reciprocity of obligation and duty, there is no authority for enforcing specific performance of it in favor of a party, who, on his part, has not performed, cannot be compelled to perform, and is not capable of performing.

9. *Failure of consideration· defeats the remedy.*—When there has been a failure, or partial failure of the consideration of the contract, or a substantial part thereof, by the occurrence of something which either determines the existence, or the subject matter, or materially affects it, so that the party seeking performance cannot on his part, substantially perform the obligations assumed by him, a court of equity will not decree specific performance.

10. *Adequate remedy at law defeats the remedy.*—Provisions in a a contract requiring a party to renew and repair certain railroad crossings under the superintendence and to the satisfaction of the other party, and failing therein to be liable for the expense of keeping up the crossings, and the further provision that the second party might, in its discretion, maintain signals and watchmen at the crossings at the expense of the first party, are not such as a court will specifically enforce, since by the terms of the contract, the failure to perform them created only a money liability enforceable in a court of law.

11. *Mistake as a defense.*—A court of equity will not enforce the specific performance of an agreement entered into under mistake, although the complainant was not guilty of improper conduct, and the mistake was solely that of the defendant, if it appears inequitable that there should be a specific performance.

12. *Compromise agreements may be enforced.*—Agreements by way of compromise, made in settlement or avoidance of litigation, are favored in the law, and may be specifically enforced in the absence of fraud, misrepresentation or concealment, even though it be afterwards discovered that no foundation existed for the doubt as to legal rights which led to the compromise.

13. *Relative benefit and injury considered.*—Among the considera-

tions which aid the discretion of the court in determining the justice of the complainant's claim for specific performance, is that of the relative benefit to the complainant, and injury or hardship to the defendant, that may be caused by the strict enforcement of the agreement. When the sole purpose of the party seeking performance in procuring the execution of the agreement has been frustrated and rendered incapable of accomplishment by the disclosure of matters not previously known, or by circumstances subsequently occurring, not due to conduct of the other party, so that specific performance would be useless or of little benefit to him, but of great injury to the defendant, the ground for exercise of the jurisdiction is taken away, and equity will leave the parties to their remedies at law.

14. *Reservation in deed, construed.*—The provision in a deed conveying to a railroad company land upon which to build a general passenger depot, "upon condition that any other railroad company now doing business in Birmingham, or which may hereafter build its road to Birmingham, shall have access to and use said general passenger depot," &c., does not reserve such benefit to a local freight railroad, which begins and ends in the city, and whose sole business is to transfer cars to and from the various railroads and manufacturing industries of the city.

APPEAL from Jefferson Chancery Court.

Tried before Hon. THOMAS COBBS.

The appeal is taken from the final decree on pleadings and proof, granting complainant relief. The case is stated in the opinion.

THOS. G. JONES, for appellant.—The contract to be specifically enforced must be founded on a valuable consideration. It must be fair, equal and just in all its terms and circumstances. The contract and the situation of the parties must be such that the remedy of specific performance will not be harsh or oppressive. If the contract is itself unfair, one-sided, unjust and unconscionable, entered into by mistake, or affected by any other inequitable features, specific performance will not be decreed, but the parties will be left to their remedies at law.—Pomeroy Equity Jurisprudence, Vol. 3, §1405; Waterman on Specific Performance, §§158-186; *Dodd v. Seymour,* 21 Conn. 475; *Coe v. N. J. Mid. R. R.,*

31 N. J. Eq. 150; *Irwin v. Bailey*, 72 Ala. 467; *Mc-Bryde v. Sayre*, 86 Ala. 458; *Moon v. Crowder*, 72 Ala. 79; *Daniel v. Collins*, 57 Ala. 628; *Willard v. Tayloe*, 8 Wall. 557; *Trustees v. Thatcher*, 87 N. Y. 311; *Lord Brougham Gould v. Kents*, 2 M. & K. 303; *Kenderly V. C., Teckell v. Gray*, 4 Drew. 660; Story Eq. Jur. (10 ed.) 750; Clark on Cont. 87, R. 184; 34 N. J. Law, 54; *Phenix Ins. Co. v. Rink*, 110 Ill. 191; *Harrisman v. Harrisman*, 12 Gray, 341; *Tucker v. Burtle*, 85 Mo. 114. The court will not enforce a contract which increases danger to the traveling public, and impedes a railroad in the discharge of its *quasi* public duties, when no corresponding benefit can inure to the other party by specific performance.—*T. & P. R. R. Co. v. Marshall*, 136 U. S. 405; *Windham v. Cotton Mfg. Co.,* 23 Conn. 384; *Conger v. N. Y. etc. R. R.,* 120; *Coe v. Midland Ry.,* 31 N. J. Eq., 159; *Thatcher v. Trustees,* 87 N. Y. 311; *Gervias v. Edwards,* 2 Dr. & W. 80. Equity will not enforce specific performance of continuous duties involving personal labor and skill of a particular kind, extending through a series of years.—*Iron Age Publishing Co. v. Western U. Tel. Co.,* 83 Ala. 510; *Marble Co. v. Ripley,* 10 Wall. 339; *D. & P. R. R. Co. v. P. & C. R. R. Co.,* 30 N. Y. Eq. 12; Waterman on Specific Performance, 49; *A. R. R. Co. v. Speer,* 32 Ga. 550; *Columbus Railroad v. Watson,* 26 Ind. 50; *Coswell v. Gibbs,* 33 Mich. 331; *Cooper v. Pena,* 21 Cal. 403; *Huff v. Sheppard,* 58 Mo. 242; *Ballou's Appeal,* 19 Am. Rep. 30. Where a contract is to be performed to the *satisfaction* of another, that other, and not the court, is the final judge as to what constitutes satisfactory performance.—*Allen v. Mutual Compress Co.,* 101 Ala. 576; *Gibson v. Crenage,* 39 Mich. 49; *Tyler v. Ames,* 6 Lansing, 280; *McCarren v. McNulty,* 7 Gray, 139. Mutuality of remedy is as essential as mutuality of obligation. The court will not enforce a part unless the whole can be enforced.—Pomeroy on Cont., 162-3; 83 Ala. 498; 72 Ala. 79; 21 Cal. 404; 10 Wall. 359; Pomeroy Eq. Jur., 1405; *Hall v. Loomis,* 3 N. W. 374; Waterman on Spec. Perf., 389-90-92; *S. W. R. Co. v. Wythe,* 5th Dig. M. & G. 880; *Fallon v. Ry. Co.,* 1 Dillon 121; *Latin v. Hazard,* 27 Pac. Rep. 515. The court will not interfere to enforce a forfeiture.—16 Atl. Rep. 6; 10 N. J. Eq. 489; 41 Penn. St.

31; 14 So. 207. The power to build "street railroad" did not empower Elyton Company to acquire lands for a freight "belt railroad."—Elliott on Roads and Streets, 557; *Carlisle v. Stillwater Street R. R. Co.*, 28 Minn. 373; *Omaha Horse R. R. Co. v. Cable Tramway Co.*, 30 Fed. Rep. 324; *Thomson-Houston Elec. Co. v. Simon*, 20 Oregon 60; *Louisville R. R. v. Louisville City Co.*, 2 Duvall (Ky.) 178; *Ex parte Selma & Gulf R. R.*, 46 Ala. 247-8; *Taber v. C. & I. R. R.*, 15 Ind. 49; *Meyer v. Johnson*, 53 Ala. 309; *Redfield on Railways*, 579; *Morgan v. Donovan*, 58 Ala. 24; *Moog v. Mayor*, 53 Ala. 561. Complainant acquired only the right of its grantor.— *Carlisle v. Terre Haute R. R.*, 6 Ind. 36.

ALEX T. LONDON, *contra.*—The main equities of the case have been disposed of on the former appeal.—98 Ala. 400. In regard to the proposition that the Elyton Land Co. had no power to construct the railroad in question, it would seem sufficient to say that no such question was made in the court below.—*Pullman Car Co. v. Central Transportation Co.*, 139 U. S. 62, 63, and authorities there cited. It is conceded that appellee had the power to build and maintain the track in question, and it is settled if a corporation in anticipation of the grant of power enters into a contract in excess of its powers, and subsequently the power is conferred, the contract becomes valid as a corporate act.—27 Am. & Eng. Encyc. Law, 391; 2 Morawitz on Corp. 651. The appellant by standing by and permitting the appellee to build its track is estopped to dispute its right to construct it.—*A. G. S. R. R. Co. v. S. & N. R. R.*, 84 Ala. 570; *M. & M. R. R. v. Gilmer*, 85 Ala. 422, 434; 2 Herman on Estoppel, 1223; 7 Am. & Eng. Encyc. of Law, 12, n. 6; *Hendricks v. Kelly*, 64 Ala. 386. Having tied the hands of appellee by agreement, defendant can not repudiate the contract, and retain its benefits. It is bound at least to make restitution to the appellee. Appellant can not complain at injuries that may result by reason of its own subsequent acts, with full knowledge of complainants' rights; nor because in the light of subsequent events the concessions on its part were greater than those of the other party to the contract.

BRICKELL, C. J.—The bill of complaint in this

cause was filed on November 28th, 1889, by the appellee against the appellant, and sought to have enforced by injunction the specific performance of that part of an agreement made in July, 1887, between the Elyton Land Company and the appellant, by which the latter granted to the former, among other privileges, the right to build a track for a belt railroad, then being built, on its right of way from a point between Twenty-ninth and Thirtieth streets to a point three hundred feet east of the east line of Twenty-fourth street, a distance of twenty-four hundred feet, in the city of Birmingham. This agreement, besides granting the privilege above mentioned, also gave the Elyton Land Company the right to cross the tracks of the appellant, at Thirty-second street, at Avenue B, and at Avenue F, upon certain terms or conditions which were, that the appellant should have the right to cross the track to be constructed by the Elyton Land Company, on the right of way of appellant, between Twenty-ninth and Twenty-fourth streets, whenever and wherever it might desire to build sidings to manufacturing establishments, etc., and that the cost of putting in the crossings of such sidings and the crossings at Avenues B and F and at Thirty-second street, should be borne by the Elyton Land Company, that said crossings should be maintained and renewed by that company to the satisfaction and under the superintendence of the appellant, and if it should fail to renew or repair the same within thirty days after notice to do so, the appellant might renew or repair the same, at the Elyton Land Company's expense; that the appellant should have preferential rights at such crossings, and could, if it be deemed necessary, erect and maintain signals and employ watchmen at the Avenue B and Thirty-second street crossings at the expense of the Elyton Land Company. The consideration expressed in the agreement for the grant of these privileges was the compliance by the Elyton Land Company with the above terms, and the grant by it to the appellant of the right to cross a certain thirty-five feet strip of land, and all tracks which the Elyton Land Company might build thereon, lying north of and adjoining the right of way of the appellant, and extending from Twenty-fourth street in a westerly direction to Eighteenth street, which strip, or a right of way over which, was stated in

the agreement to belong to the Elyton Land Company. The Highland Avenue and Belt Railroad Company, the complainant and appellee, has succeeded to all the rights of the Elyton Land Company under this agreement.

This case came before the court at a prior term on an appeal from a decretal order overruling defendant's demurrer to the bill.—*S. & N. A. R. R. Co. v. H. A. & B. R. R. Co.,* 98 Ala. 400. It was then decided that it appeared from the face of the agreement that there were mutuality of obligation and equitable remedy for its enforcement, and adequacy of consideration, and that the agreement was such as a court of equity could specifically enforce. Since that decision an important amendment to the bill has been made. The original bill averred that the Elyton Land Company had the legal title to a strip of land thirty-five feet in width lying north of, parallel to, and adjoining the South & North Co.'s right of way, extending from Twenty-fourth street to Eighteenth street, and had a right of way over said strip, and that it was necessary in order to reach this strip, to build a track along defendant's right of way as above described, and that it was for the purpose of reaching its own right of way over this strip that it procured the agreement. It now appears from the amendment, that said company did not own this strip at the time the agreement was made, or at the time the bill was filed, and it clearly appears from the evidence in the record, and the decisions of this court, rendered since the agreement was made and the original bill was filed, that it did not own a right of way over it, but, on the contrary, that the defendant owned the exclusive right of way over the same. It does not appear, however, that any demurrer was interposed after this amendment was filed, and it is not, therefore, necessary to re-open the questions decided on the former appeal. The case now comes before us on an appeal from a final decree on the pleadings and evidence granting the relief prayed for.

When this agreement was entered into, in July, 1887, the Elyton Land Company was engaged in building a belt railroad in and around the city of Birmingham, for the purpose of doing a transfer freight business, that is, transferring freight cars from one railroad to another, or to and from manufacturing industries and the

various railroads.  In the construction of this road, if
it had authority under its charter to construct it, it had
the right, upon making just compensation, "to intersect
connect with, or cross any other railroad."—Const. Art.
XIV, §§7, 21.  It also had a right to take a portion
of the right of way of the defendant, upon showing a
reasonable necessity therefor, and that such taking
would not destroy the usefulness of the right of way as
a franchise, or so impair the capacity of the easement
as to render it unsafe; and both of these rights could
have been enforced by statutory proceedings provided
for this purpose.—*Mobile & Girard R. Co. v. Ala. Mid.
Ry. Co.,* 87 Ala. 501; *Anniston & Cin. R. Co. v. Jackson-
ville G. & A. R. Co.,* 82 Ala. 297.  If, however, the Ely-
ton Land Company had no authority under its charter
to construct such a railroad, it had no power to receive
and hold, either by grant or by condemnation, land for
the use of such railroad, and therefore could not by re-
sorting to such statutory proceedings, have condemned
said crossings or right of way, if such proceedings had
been resisted by the defendant.  The court would not
have aided it to acquire land which it had no authority
to hold, although it might not interfere to deprive it of
such land after its acquisition, except at the instance of
the State.—*Case v. Kelly,* 133 U. S. 28; *Thompson-
Houston Electric Co. v. Simon,* 20 Or. 60 (s. c. 10 L. R.
A. 251, and notes).  It is manifest from the evidence
that the defendant, and presumably the Elyton Land
Company also, executed the agreement in the belief that
the latter could have condemned the crossings and right
of way for which the agreement provides.  Smith, the
vice-president and active manager of the defendant com-
pany, who executed the agreement on the part of the
defendant, testifies that for several months prior to
the execution of the agreement he had been subject to
great anxiety as to the probable action of the Elyton
Land Company.  He had learned indirectly that it con-
templated the construction of a number of crossings
that would be very injurious to the South & North Ala-
bama Railroad Company, among them, crossings in the
vicinity of Thirteenth and Fourteenth streets, near the
Alice Furnace and the Birmingham Rolling Mills, and
had given the officers and attorneys of his company in-
structions to resist any attempt to effect crossings at

8

these points. "Long negotiations ensued, and as the Elyton Land Company had secured legislative authority to condemn crossings with other railroads, I thought at the time that it might be for the interests of the South & North Alabama Railroad Company to accept the terms of the pretended agreement, which terms did not involve a crossing in the vicintiy of Thirteenth and Fourteenth streets, and while it did provide for a crossing at Avenue B and Ninth street, I was of the opinion that the Elyton Land Company would never construct such crossing. I did not at the time know that one of the objects of the Elyton Land Company, in desiring to construct the track along the right of way of the South & North Alabama Railroad Company from a point near Twenty-ninth street to Twenty-fourth street, was to secure a connection with the tracks approaching the Union Passenger Station." Now it clearly appears, as we shall show hereafter, that the Elyton Land Company had no power to construct a freight belt railroad and therefore could not have condemned said crossings or right of way. As both parties believed it had such power, and the defendant believed that the exercise of the power would be of great injury to its interests, if directed to the condemnation of crossings at certain points, it is evident that the agreement was in the nature of a compromise between the parties, such as is of frequent occurrence between railroad companies, by which both would avoid the expense and delay of litigation, the Elyton Land Company would obtain what it desired by making concessions to the defendant, and the defendant would escape the threatened injury by making concessions which, though detrimental in themselves, as recited in the agreement, would be less so than the condemnation of the crossings at the points feared. While the Elyton Land Company did not bind itself not to attempt to condemn crossings at such places, it contracted for the right to cross at Avenues B and F, further west and south, and evidently abandoned its intention, if it ever had any, to cross elsewhere in that section of the city.

It is important to give due weight and consideration to these matters, since they tend to show the motives of the parties, and serve to throw light upon the objects sought to be obtained, the inducements which led to the

execution of the agreement, and the entire scheme and design of both parties. On the one hand, it appears that the sole purpose of the Elyton Land Company in obtaining the right to build its track on the right of way of the defendant, was to reach what it believed to be its own right of way along the thirty-five feet strip extending from Twenty-fourth street west to Eighteenth street, and this with the ultimate purpose of obtaining access to the Union Passenger Station. On the other hand, the defendant, not knowing this to be the purpose of that company, executed the agreement in the belief that said company had the power to acquire by condemnation, the privileges conferred by the agreement, and owned or had a right of way over said thirty-five feet strip, and that the benefit accruing to it by reason of the privileges therein conferred upon it to cross said thirty-five feet strip and any tracks which the said company might build thereon, together with the escape from the threatened crossings at Thirteenth and Fourteenth streets, would, in a measure, compensate it for the detriment caused by the exercise by the Elyton Land Company of the privileges conferred by the agreement.

In the further consideration of the case we will discuss only three questions: First, whether the want of power in the Elyton Land Company, to take or receive property for the construction and uses of a belt railroad, is a bar to a suit for the specific performance of the agreement, at the instance of the complainant, its successor, having such power conferred by its charter? Second, whether there has been such failure of the consideration upon which the privileges were granted to the Elyton Company, or such mistake or misapprehension, as bars the specific performance of contracts or agreements? Third, whether the inutility to the complainant of the specific performance of the agreement, and the hardship, injury and inconvenience it will cause to the defendant, renders a decree for specific performance inequitable?

1. The Elyton Land Company was originally a land corporation, and had no power, prior to the act of the legislature, adopted February 4th, 1885, enlarging its powers and franchises, to construct or operate a railroad of any kind. By this act it was given the power "to build, own and operate street railroads, and use

thereon cars propelled by horse, steam or other motive powers, . . . but no street railroads shall be constructed on the streets of the city of Birmingham without the consent and authority of the city council." No other powers with respect to street railroads or railroads of any kind were conferred by the act, and no express power was given to construct such railroad except upon the public streets or highways, or to condemn the property of other railroads or of individuals. The term "street railroad" is applied to "a railway passenger carrier whose road lies along and upon the streets of a city, town or village."—Elliott on Roads & Streets, p. 557; *Thompson-Houston Electric Company v. Simon,* 20 Or. 60; *Carlisle v. Stillwater Street R. Co.,* 28 Minn. 373. From this power given to a land corporation, which previously had no power to construct a railroad of any kind, to construct a street railroad, no authority can be derived to construct a freight belt railroad in and around the city, for the sole purpose of transferring freight cars to and from factories and other railroads. If the Elyton Land Company had any power of condemnation at all, it was certainly such only as was incident to street railroad companies and only as to such lands as were necessary for a right of way and structures necessary and incident to its business. Indeed, it may be doubted whether a street railroad company, having no express power to construct its railroad elsewhere than on the public streets and highways, has any authority to either condemn or receive for a right of way or other purposes, property not located on such public streets or highways, since its charter does not contemplate the necessity or use of such property. The right of way of the defendant, upon which the Elyton Land Company contracted for the right to build its track, is not a public street or highway in this sense; but is a broad avenue running through the city, the property of the defendant, donated to it by the Elyton Land Company for railroad purposes, when it founded and laid out the city. But it can not be doubted that this corporation had no authority to take or receive, either by condemnation or by grant, property for the use of a freight belt railroad, which it had no power to construct or operate.

It is a principle of universal application that if a corporation has acquired the title and possession of real

property, its right to hold it can not be questioned by a private citizen. This question is, one between the corporation and the government. The State alone can question the right in a direct proceeding instituted for this purpose.—*Chicago, B. & Q. R. Co. v. Lewis,* 53 Iowa 101; *Hickory Farm Oil Co. v. Buffalo, N. Y. & P. R. Co.,* 32 Fed. Rep. 22; *Ragan v. McElroy,* 98 Mo. 349; *Reynolds v. First Nat. Bank,* 112 U. S. 405; *Fritz v. Palmer,* 132 U. S. 282. But if it is necessary for the corporation to seek the aid of a court of equity to perfect its title, an interested individual may contest its claim, and the court will, in case it has no right to hold property of the particular kind in controversy, refuse a decree in its favor.—*Morgan v. Donovan,* 58 Ala. 241; *Case v. Kelly,* 133 U. S. 21; *Pacific R. Co. v. Seely,* 45 Mo. 212; Waterman on Spe. Per., §223. See also *Re McGraw's Estate,* 111 N. Y. 66; *Chamberlain v. Chamberlain,* 43 N. Y. 424. It is also held that a court will not aid it to obtain the possession and enjoyment of the property, even though a deed has been executed, except as against a trespasser, where the question involved is the determination of the right to possession, and not of the title; but the authorities are not in harmony upon this point.—United States Trust Co. v. Lee, 73 Ill. 142; *St. Peter's Roman Catholic Cong. v. Germain,* 104 Ill. 440; *Quaker Society v. Dickerson,* 1 Dev. L. 189. There have been few cases in which the principle above stated has been directly decided, but we have not been able to find any authority to the contrary, although there are many cases, some of which are cited above, which hold that where a deed has been executed and delivered, or the consideration has been paid, or where the question involved is, not the right of the corporation to hold property of a particular kind or for a particular purpose, but its right to hold property in excess of a definite quantity or value, a private citizen, though interested, can not question the right.—*Smith v. Sheeley,* 12 Wall. 358; *Myers v. Coft,* 13 Wall. 291; *American & Foreign Christian Un. v. Yount,* 101 U. S. 352; *Rutland & B. R. Co. v. Proctor,* 29 Vt. 93. We do not think the agreement in this case has ever been executed, or that any consideration has ever been paid, in such sense that to permit the capacity of the Elyton Land Company to acquire and hold title to the privileges con-

ferred to be questioned, would be against justice and accomplish a legal wrong. The Elyton Land Company, after the execution of the agreement, during the latter half of the year 1887, crossed the tracks of the defendant at Thirty-second street, and built on its own land down to a point between Twenty-ninth and Thirtieth streets where it entered the defendant's right of way, and built thereon a distance of 988 feet, a little more than one-third of the whole distance, to a point near Twenty-seventh street, where the tracks of the Georgia Pacific Railway Co. crossed said right of way. At this point it was found that the crossing which had been made to cross the Georgia Pacific Company's tracks did not fit, and it was taken out, and for some reason, not explained, no further work was done. In March, 1888, the Savannah & Western Railroad Company, having just been completed to Birmingham, desiring to obtain access to the Union Passenger Station, entered into a contract with the defendant, by which it acquired the use of the same portion of the right of way claimed by complainant, and extended the track built by complainant to a connection with the tracks assigned to the use of the passenger trains running into the Union Passenger Station, using the portion of the track built by the complainant. It appears that this company also obtained from the complainant parol license to use temporarily the track built by it, but whether this was before or after the contract of the Savannah & Western Company is not shown. It is clear, however, from the evidence that the defendant has been in possession of said track and right of way since March, 1888, and that the complainant never was in possession thereof for a longer time than was required to build it.

It results from what has been said that the agreement, with respect to the right to build a track along defendant's right of way from Twenty-ninth street to Twenty-fourth street, could not have been specifically enforced at the suit of the Elyton Land Company, and it follows that the complainant, who succeeded to its rights, although it possesses the powers the lack of which incapacitated its grantor to take property of this character, can not seek the aid of a court of equity to perfect its title to, or obtain the possession of such property, unless the defendant has recognized, or in some

way estopped itself to deny, its rights under the agreement. It succeeded only to the rights of the Elyton Land Company. If the latter acquired no right under the agreement to build the track on defendant's right of way, it could transfer none to the former. We have been unable to find anything in the record that tends to show any recognition by the defendant of any rights acquired by the complainant, or any matter of estoppel. It does not appear from a careful search of the testimony, that the defendant had any knowledge, until long after it had impliedly repudiated the agreement by taking possession of the track and right of way, that the complainant had succeeded to the rights of the Elyton Company, or had built any part of the track along said right of way; nor that it ever recognized in the complainant any right or interest in the right of way. No estoppel, and no recognition of the rights claimed by the complainant, sufficient to prejudice the defense, arise from the fact that the defendant, or the Louisville & Nashville Railroad Company, even though the two corporations be considered identical, presented to and received from complainant payment of a bill for a crossing which had been put in at Thirty-second street. The right of the complainant to cross defendant's tracks at Thirty-second street is not in controversy here, and it does not appear that such right has ever been denied. The account was presented after the bill in this case had been filed by the assistant engineer or the superintendent of the defendant, more than two months after its vice-president and active manager had expressly repudiated that part of the agreement here sought to be enforced, and more than two years after the repudiation implied from the taking possession of and using the right of way, and was not paid until October 15th, 1890, nearly a year after the bill had been filed. These facts constitute no recognition of the right of the complainant to build its track on the right of way of the defendant between Twenty-ninth and Twenty-fourth streets.

2. In the granting or withholding of a decree of specific performance the court is invested with a discretion; not arbitrary or capricious, but a sound judicial discretion, controlled by fixed rules and principles. It moulds and tempers its action, or refusal to act, accord-

ing to the special features and incidents of each case, and from them determines whether the conscience of the party charged with a violation of the contract is so affected that moral and equitable duty compel him to a strict performance, rather than to a payment of such damages as a court of law would award against him. The court will examine the contract and the circumstances attending its execution, to ascertain what in truth was the real intention of the parties, and carry that intention into effect; or, if it can not be carried into effect, leave the parties to their legal remedies. In every case the question must be, whether the exercise of the power of the court is demanded to subserve the ends of justice; and unless the court is satisfied that it is right in every respect, it refuses to interfere.—*Irwin v. Bailey*, 72 Ala. 472; Waterman on Spec. Per., §6. There must be in the contract mutuality of obligation and equitable remedy for its enforcement.—Pomeroy on Contracts, §162. "A contract, to be specifically enforced, must be mutual—that is to say, such that it might at the time it was entered into, have been enforced by either of the parties against the other of them. Whenever, therefore, whether from personal incapacity, the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is incapable of enforcing it against the other, though its execution in the latter way might be free from the difficulty attending the execution in the former."—Fry on Spec. Per., §286. When a contract, in its nature and character, and according to the intention of the parties, involves and imposes a reciprocity of obligation and duty, there is no authority for enforcing specific performance of it in favor of a party, who on his part has not performed, can not be compelled to perform, and is not capable of performing.—*Cooper v. Pena*, 21 Cal. 404. If he can not perform the obligations assumed by him as a consideration for the assumption by the other party of the obligations sought to be enforced, he can not obey the injunction imposed by the equitable maxim that "he who seeks equity must do equity," and is not, therefore, in a situation to invoke the aid of the court. Hence it follows that when there has been a failure, or partial failure of the consideration of the contract, or a substantial part thereof, by

the occurrence of something which either determines the existence or the subject matter or materially affects it, so that the party seeking performance can not, on his part, substantially perform the obligations assumed by him, a court of equity will not decree specific performance.—Waterman on Spec. Per., §189; *Butman v. Porter*, 100 Mass. 337; *Morrill v. Aden*, 19 Vt. 505. To do so would be to require the performance of a contract different from that made by the parties, wanting in fairness and mutuality of obligation and equitable remedy, and lacking in all those elements which appeal to the discretion of the court in favor of the exercise of its jurisdiction to decree specific performance.

That which constituted the most substantial part, if not the real consideration expressed in the agreement for the granting of the privileges claimed by the complainant, apart from the undisclosed motive which led to its execution by the defendant, was the reciprocal right given to the defendant to cross the thirty-five feet strip extending from Twenty-fourth street to Eighteenth street, and such tracks as the Elyton Company might build thereon. Of the other matters, agreed to be performed by the Elyton Company, some were such as statutes in force at that time required it to perform, and therefore constituted no valid consideration, such as the giving to defendant of preferential rights at the crossings.—Code, §1145. Others were the mere terms or conditions upon which it was to exercise the privileges granted; while the rest were, perhaps, actual, valuable considerations, such as the obligation to renew and repair the crossings under the superintendence and to the satisfaction of the defendant when called upon to do so, and to pay for the erection and maintenance of signals and the employment of watchmen. But these latter were not such as a court of equity could or would specifically enforce, since by the terms of the agreement, the failure to perform them would create only a money liability enforceable in a court of law.—*Railroad Co. v. Railroad Co.*, 98 Ala. 407. In the case just cited, which was an appeal from a decretal order overruling the demurrer interposed to the bill in this case, it was said, in discussing the adequacy of the consideration expressed in the agreement: "Nor can we know the value of the

privilege of crossing the thirty-five feet strip whenever and wherever the South & North Co. might choose to do so;" and again, in discussing the want of mutuality, "Each party bound itself to grant to the other the use of the easement in what had been the exclusive property and right of the party granting. Each right and interest granted became the consideration for the right and benefit secured in return." We are now informed by the undisputed evidence that the agreement failed to grant an easement in the property of the Elyton Company, the thirty-five feet strip above mentioned, and that the grant of the privilege to cross said strip attempted to be conferred upon the defendant was valueless to it, since it already possessed the right and the Elyton Company could not grant it. Whether the defendant knew at the time that it had the right to cross the strip in the absence of such agreement, does not appear from the evidence. The question as to its right arose, subsequently, however, for in September, 1889, more than two years after the execution of the agreement, the Elyton Company instituted a suit in ejectment against the defendant to recover possession of the strip and a continuation thereof, extending from Twenty-fourth street to and beyond Fourteenth street. On appeal from the judgment in that case, this court held that the Elyton Company, by its conduct, and by certain deeds and contracts made long prior to the execution of the agreement in this case, had forfeited all right to the use of the strip in dispute, and was not entitled to the possession thereof, and that the right to use it for railroad purposes was vested in the defendant alone.—*Elyton Land Co. v. S. & N. Ala. R. Co.,* 95 Ala. 644.

Thus there has been a failure of a substantial part of the consideration for the grant of these valuable rights to the Elyton Company, such as materially affects the subject matter of the contract. The complainant, recognizing the maxim that "he who seeks equity must do equity," has offered in the bill to perform all the obligations imposed by the agreement upon the Elyton Company, yet the evidence shows a total want of ability on its part to perform a material part of those obligations. It is true, the defendant would not now be benefitted by such performance, since it has been judicially decided that it already was entitled to the right for

which it contracted. But this is immaterial. The agreement without the stipulation for the right to cross the thirty-five feet strip, is not the agreement the parties made or intended to make. The fact that the defendant already possessed this right, leads to the conclusion that the entire agreement was entered into under a mistake as to two facts: First, that the Elyton Company owned said strip, or a right of way over it, and would build a track thereon, and, second, that it had authority to condemn a portion of the right of way of the defendant, and crossings over its tracks. A court of equity will not enforce the specific performance of an agreement entered into under mistake, although the complainant was not guilty of any improper conduct, and the mistake was solely that of the defendant, if it appears inequitable that there should be a specific performance.—Waterman on Spec. Per., §361. It can not be doubted, that the agreement would not have been entered into, if the defendant had known that it already owned the exclusive right to the use of this thirty-five feet strip, and that the Elyton Company had no power to condemn any part of its right of way or crossings over its tracks. We do not wish to be understood as deciding that this last mentioned mistake is sufficient of itself to justify a refusal to grant specific performance. This mistake, and the fear occasioned by it that the Elyton Land Company would condemn crossings near Thirteenth and Fourteenth streets, was a mere undisclosed motive on the part of the defendant, which induced it to accept the supposed benefits accruing from the agreement as a sufficient compensation for the inconvenience and injury it would suffer by reason of the exercise of the rights granted; it was no part of the consideration of the agreement. It is altogether probable, as said above, that the agreement was in the nature of a compromise; and such agreements, made in settlement or avoidance of litigation, are favored in the law, and may be specifically enforced, in the absence of fraud, misrepresentation or concealment, even though it be afterwards discovered that no foundation existed for the doubt as to legal rights which led to the compromise. But this mistake considered in connection with the failure of consideration, convinces us that the conscience of the de-

fendant is not so affected by its promise and the circumstances attending its making, that moral and equitable duty compel it to a strict performance, and that it would be inequitable to specifically enforce against the defendant an agreement which, by reason of facts existing at the time but not disclosed until afterwards, would give to it little or nothing in return for the rights enforced, when, as we shall see hereafter, such performance will be practically useless to the complainant

3. But we think another, and perhaps stronger, reason than any yet considered exists for refusing the relief prayed for. Among the considerations which aid the discretion of the court in determining the complainant's claim for specific performance, is that of the relative benefit to the complainant and injury or hardship to the defendant that may be caused by the strict enforcement of the contract. Specific performance has been defined to be "the actual accomplishment of a contract by the party bound to fulfil it," and the origin and main ground for the exercise of its jurisdiction by equity to require the strict accomplishment of the contract, was that the failure to obtain the thing itself contracted for might not be capable of compensation in money. But when the entire scheme and design of the party seeking specific performance in contracting for that which he seeks to have accomplished, and his sole purpose in procuring the execution of the agreement, have been frustrated and rendered incapable of accomplishment by circumstances subsequently occurring, not due to the conduct of the other party, or the disclosure of matters not previously known, so that specific performance would be useless or of little benefit to him, but of great injury to the defendant, the ground for the exercise of this jurisdiction is taken away, and equity will leave the parties to their legal remedies.—*Trustees v. Thacher*, 87 N. Y. 311; *Conger v. New York W. S. & B. R. Co.*, 43 Am. & Eng. R. Cas. 643; *Murfeldt v. N. Y. W. S. & B. R. Co.*, 102 N. Y. 703. Since the execution of this agreement various decisions have been rendered by this court in litigation between the same parties, the effect of which is, to render of no avail to complainant for the purpose for which it desired it, the accomplishment of that part of the agreement by which it sought to acquire a right to use this right of way.

It clearly appears both from the bill and from the evidence, that the complainant's railroad was what is known as a "belt railroad," built in and around the city of Birmingham for the purpose of transferring freight cars to and from the various railroads entering the city and the manufacturing industries located in and about the city. The purpose and design of the Elyton Company, in procuring the right to build twenty-four hundred feet of the track of this railroad on the defendant's right of way, was to reach the thirty-five feet strip at Twenty-fourth street, which it was supposed to own or have a right of way over, its ultimate object being to build its track over this strip into the Union Passenger Station, which is located at Twentieth street, directly in the line of this strip.

On April 21st, 1871, the Elyton Land Company, which was the founder of the present city of Birmingham, and owned all the land upon which it is built, conveyed to the Alabama and Chattanooga Railroad Co. and the South & North Alabama Railroad Co. a broad strip of land running through the city, upon the conditions that they would build their tracks, depots, shops, etc., thereon, and would give to the first two railroads entering the city a sufficient quantity of the land conveyed for like purposes; and that a portion of the land near the center thereof should "be appropriated and used forever as a general passenger depot for each and every railroad ending in the said city of Birmingham with a right of way to the same;" and upon the further condition that the South & North Alabama Railroad Co. should have the perpetual and free use of the right of way over the Ala. & Chat. Railroad Co. "in a manner to be described by a deed," and that two strips of land, each thirty-five feet in width, one of which is the strip above mentioned, should be held by the Elyton Company, "as a perpetual right of way for all railroad companies doing business in and through the said city as aforesaid." On May 4th, 1872, the same company conveyed to this defendant, its present right of way, one hundred feet in width, by a deed containing the following proviso: "Provided, however, that any other railroads running into or through the city of Birmingham, shall have the right to run a parallel track upon and along the same right of way." In the year 1881, the

Elyton Company, upon a bill filed averring that all the railroad companies for whose benefit the deed of April 21st, 1871, was made had failed to comply with the conditions of the deed, except the South & North Alabama Railroad Co., obtained a decree annulling said deed and revesting the title in the Elyton Company, except as to the rights acquired thereunder by the South & North Alabama Railroad Co., which were left unimpaired. Afterwards, on April 28, 1882, by a deed which recited the conveyance of April 21st, 1871, and that the same had been annulled as aforesaid, the Elyton Company conveyed to the defendant, a part of the land described in the deed of April 21st, 1871, 900 feet by 182.5 feet, "the same to be used as a general passenger depot by said party of the first part [this defendant] for the convenient transaction of its passenger business in said city of Birmingham, upon the condition that any other railroad company now doing business in Birmingham, or which may hereafter build its railroad to Birmingham, shall have access to and use said general passenger depot upon equitable terms, to be agreed on between said railroad companies and the South & North Alabama Railroad Company." This deed recited that the land conveyed therein was accepted by the grantee as the residue of the lands described in said deed of April 21st, 1871, to which it was entitled thereunder; and further provided that the deed was in nowise to impair, waive or release any right which the defendant had acquired by the former deed in and to the two thirty-five feet strips described therein as reserved for a common right of way for all railroads, but as to all other railroad companies the right to use these strips was abrogated.

Since the agreement in this case was executed, as stated above, this court has decided that the Elyton Company, by its act in procuring the decree above mentioned, and by the deed of April 28th, 1882, had lost all the right and interest it had in the thirty-five feet strip described in the bill in this case, and that the defendant had acquired the exclusive right to occupy the same for railroad purposes.—*Elyton Land Co. v. South & North Ala. R. Co.*, 95 Ala. 631-644. At the last term, on an appeal rendered in a suit between the same parties, we decided that a belt railroad is not such a railroad as is entitled to the benefits reserved in the deed of May 4th,

1872, viz., the right to build a parallel track on the right of way conveyed by that deed to this defendant.—*South & North Ala. R. Co. v. Highland Ave. & Belt R. Co.,* in MSS. For reasons similar to those which led to this conclusion in the last mentioned case, we are of the opinion that this complainant is not entitled to the benefits reserved for other railroads in the deed of April 28th, 1882, which conveyed to defendant land upon which to build a general passenger depot, "upon the condition that any other railroad company now doing business in Birmingham, or which may hereafter build its road to Birmingham, shall have access to and use said general passenger depot upon equitable terms, etc." It is too obvious to require discussion, that this provision can have no reference to a local freight railroad, which begins and ends in the city, and whose sole business is to transfer cars to and from the various railroads and manufacturing industries of the city. It contemplated only those railroads which are the great public highways or thoroughfares for public travel and commerce, whose duty to the public requires them to erect and maintain passenger stations for its accommodation and comfort. It does not appear that the complainant ever contemplated the construction of such a railroad, although its charter incidentally gives it the power to build and operate a railroad to any other county of the State.

Thus it is, that the complainant can neither construct its road on said thirty-five feet strip, nor obtain access to or entrance into the Union Passenger Station. These were the only objects it sought to accomplish by the agreement. Of what benefit, then, would the specific performance of the agreement be to it? If none, or very little, or only such as it might derive from possessing the right for speculative purposes, then it would be more in accordance with justice to compensate it in money for any damage it may have sustained, by reason of the violation of the agreement and the loss of the specific thing for which it contracted, than to specifically enforce the agreement to the great injury of the defendant and the probable inconvenience of the public. That the granting of the relief sought will work hardship and injury to the defendant, appears clearly from the evidence. The agreement itself recites that the exercise

of the privileges granted "will be in many respects a disadvantage to the first party, and will obstruct to some extent the free and convenient use of its main line and other tracks," and the testimony more than corroborates this recital in the agreement and is uncontradicted. In November, 1887, or a short time thereafter, by a rearrangement of the tracks of the defendant, that portion of the right of way in controversy was occupied by the passenger tracks assigned to the use of the passenger trains of the different railroads entering the Union Passenger Station. True, this was done after the agreement was executed, and after the complainant had built its tracks to Twenty-seventh street, then, for some reason not explained, abandoned its further construction; but it does not appear what exigency caused this rearrangement of the tracks, except that it was necessary to the conduct of defendant's business. Railroad companies are public servants and are bound to increase their facilities and improve their property to meet the demands and subserve the interests of the public; and Birmingham was and is a growing city, and the demand for increased railroad facilities must increase with its growth and impose upon the defendant the necessity of utilizing its right of way in such a manner as to discharge its full duty to the public. The maps accompanying the record show the right of way to be fully occupied with tracks, those along the northern edge being marked "union depot tracks," and assigned to the use of passenger trains of the various railroads entering the Union Passenger Station, and to permit this part of the right of way to be used by the complainant for its freight traffic, would be greatly injurious to the defendant as well as to the interests of the public. Whether this hardship to the defendant and injury to the public are of themselves sufficient in degree to justify the refusal of the relief, we do not decide, but considered in connection with the utter inutility of specific performance to the complainant, it satisfies us that it would be inequitable to grant the relief prayed for.

The result is the decree of the chancellor must be reversed, and the cause remanded.

Reversed and remanded.