[L. A. No. 2213. In Bank.—March 13, 1911.]

RICHARD F. SIMONEAU, Administrator of the Estate of William Alexander Campbell, Deceased, Respondent, v. THE PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation), Appellant.

ACTION FOR DEATH—COLLISION WITH INTERURBAN ELECTRIC CAR—EXCESSIVE SPEEDING—ERRONEOUS INSTRUCTION—MUNICIPAL ORDINANCE AS TO STREET-RAILWAYS.—In an action by an administrator to recover damages for the death of the decedent from alleged negligence in excessive speeding by an interurban electric railway company at a street crossing in the city of Los Angeles, whose right of way was level with the street at all street crossings, at which it was accustomed to stop for passengers, but whose right of way was fenced between crossings, and whose track was raised at other points, it is held that such electric railway company is not a street-railway company within the meaning of a municipal ordinance limiting the speed of street-railway companies to eight miles per hour within the city limits, and requiring fenders thereon, and that an instruction applying such ordinance thereto, was prejudicially erroneous.

ID.—DEFINITION OF "STREET-RAILROAD."—The term "street-railroad" applies only to such roads the rails of which are laid to conform to the grade and surface of the street, and is otherwise constructed so that the public are not excluded from the street as a public highway, which carries only passengers from one part of a thickly populated district to another in a town or city and its suburbs. It does not depend upon the motive power, but in the definition of the term, the location and manner of construction are its most important factors; and in its entire length, it must not exclude the public from the use of the street or road as a public highway.

ID.—ELECTRIC RAILWAY EXCLUDING PUBLIC FROM LENGTH—STREET CROSSINGS.—An interurban electric railway which excludes the public from the entire length of the track when running along its fenced and private right of way, does not become a street-railway because

at street crossings it is laid flush with the surface of the street, so that passengers and vehicles may there cross the track.

ID.—CONSTRUCTION OF ORDINANCE.—The municipal, ordinance should be construed so as to require both interurban and local cars to be equipped with fenders and to limit their speed when running over street crossings, upon those portions of the tracks which are laid upon public streets in the manner of street-railways, but to exclude therefrom interurban tracks operated in the manner herein described.

ID.—SUFFICIENCY OF ISSUE AS TO APPLICABILITY OF ORDINANCE.—It is held that the answer of the defendant clearly manifests the intent of the pleader to set up facts showing the inapplicability of the ordinance, by alleging that the car with which the deceased collided crossed its private right of way, and was not a street crossing or intersection within the meaning of the ordinance set out in the complaint. It is not necessary in order to raise an issue that a denial be made in the precise words of the averment sought to be controverted; but any averment of an answer, which if found to be true, necessarily shows that the allegation of the complaint as to the same matter is untrue, is a good traverse, and sufficient as a denial.

ID.—ERROR IN GIVING AND REFUSING INSTRUCTIONS.—The court not only erred in the instruction as to applicability of the ordinance, but also erred in refusing an instruction that the municipal ordinance limiting speed was not applicable; and these errors necessitate a reversal.

ID.—RIGHTS OF PLAINTIFF UPON NEW TRIAL AS TO NEGLIGENCE.—The plaintiff upon a new trial will be entitled to offer evidence in support of each specification of negligence pleaded, including that irrespective of any legislative limitation the defendant's car was operated at a speed in excess of that which would be permitted in the exercise of due care.

ID.—SIGNAL FOR HALTING.—If it should appear in proof, as alleged, that the motorman on approaching the street crossing gave the proper signal for halting, that would have a double bearing both upon the negligence of the defendant, in failing to halt, and as tending to overcome the contributory negligence of the deceased.

ID.—NATURE OF TRACK AT CROSSING—CONTRIBUTORY NEGLIGENCE.—It is held that the nature of the track at the crossing, if no proper signal for halting was given, partook more of the nature of a steam-railroad than of a street-railroad track, as respects the exercise of caution by the deceased.

ID.—PROPER EVIDENCE ON QUESTION OF DAMAGES—CRIPPLED CONDITION OF CHILDREN.—The court properly permitted the wife of the deceased, on the question of damages, to testify that both of the children were crippled and had been for a long time and were still under the doctor's care. Among the necessaries that a father is called upon to supply to his children, none is more clearly recognized than proper medical attention; and if a child be either a temporary or a permanent invalid, additional care may be required.

APPEAL from an order of the Superior Court of Los Angeles County denying a new trial. W. P. James, Judge.

The facts are stated in the opinion of the court.

Gibson, Trask, Dunn & Crutcher, and John H. Lathrop, for Appellant.

Ernest E. Wood, for Respondent.

SLOSS, J.—Action by the administrator of the estate of William Alexander Campbell to recover damages for injuries causing the death of his intestate. The plaintiff recovered a verdict and judgment in the sum of seven thousand dollars. The defendant appeals from an order denying its motion for a new trial.

Campbell's injuries were received while he was trying to cross the track of the defendant corporation at a point where said track intersects 38th Street in the city of Los Angeles. The complaint alleges negligence on the part of the defendant in a number of particulars, of which we need mention only the following. It is averred that the agents of the defendant in charge of its car were negligently and wantonly operating the said car at a rate of speed greatly in excess of eight miles an hour and at a rate of more than twenty miles an hour; that they "sounded a whistle twice just prior to the time of reaching the said crossing as an indication that the car would slow down and stop at said crossing and then, on the contrary, negligently failed to cause the said car to slow down pursuant to said signal and thereby misled the said Campbell as to the rate of speed at which the said car would approach the said crossing"; and that the defendant negligently failed to equip its car with a life-saving fender. In addition to the general allegations of negligence in respect of excessive speed and the failure to equip the car with a fender, the plaintiff set up the terms of an ordinance of the city of Los Angeles limiting, as he claimed, the rate of speed at the place of the accident to eight miles an hour and requiring at such place the use of a fender. We shall have occasion to refer to this ordinance more in detail hereafter. The answer, in addition to denying or undertaking to deny

the various averments of negligence on the part of the defendant, alleged that Campbell's injuries were due to contributory negligence on his part.

The jury returned a general verdict, and also returned answers as follows to interrogatories submitted by the court:

"Interrogatory No. 1. If you find that the deceased came to his death by reason of the negligence of the defendant, did that negligence consist in the running of the car at an excessive rate of speed or a lack of fenders on the car?

"Answer. Excessive speed.

"Interrogatory No. 2. Was the deceased guilty of contributory negligence or did he act with ordinary care and prudence?

"Answer. First clause, No. Second clause, Yes."

The case was submitted to the jury under instructions based on the theory that the ordinance of the city of Los Angeles limiting the rate of speed of cars and requiring the use of fenders applied to the place where the accident occurred. The jury were accordingly instructed that if Campbell, while in the exercise of ordinary care for his own safety, was struck and killed by a car operated by the defendant, the plaintiff was entitled to a verdict if the car was being operated at a rate of speed in excess of eight miles an hour and if Campbell's death was caused by this excessive rate of speed. The court further instructed the jury that the failure to provide a fender, if such failure was the cause of Campbell's death, entitled the plaintiff to a verdict under like conditions.

The defendant contends that under the undisputed evidence concerning the location and nature of the track upon which the car was operated the ordinance had no application with reference either to the rate of speed or the use of a fender. The jury seems by its answer to special interrogatory No. 1 to have based its verdict upon the first ground and it will be sufficient in discussing the point to consider the question of speed alone.

The ordinance in question is numbered 12,829 and is entitled "An ordinance requiring cars operated over street-railway tracks to be equipped with fenders therein described, and regulating the operation of cars on street-railway tracks in the city of Los Angeles." Section 1 provides for the use of a fender. Section 2 reads as follows: "That from and after

CLIX Cal.—32

the passage of this ordinance it shall be unlawful for any person, firm or corporation to run or operate, or cause to be run or operated, any street-car, or any car, upon any street-railway track, upon or over any street crossing or intersection within the following district in the city of Los Angeles at a greater speed than four miles an hour, or upon or over any street crossing or intersection outside of said district, but within the city of Los Angeles, at a greater speed than eight miles an hour, . . ." The ordinance then describes a district within which the four-mile limit shall apply, said district not including the place where the accident in question occurred.

It appears by the undisputed evidence that the place where the accident occurred was within the limits of the city of Los Angeles and on the defendant's line of track running from Los Angeles to Long Beach. This line, after running in part over the streets of Los Angeles, entered upon a strip of land running north and south and held and owned by the defendant as a private right of way. This strip was intersected at a right angle by 38th Street. For a considerable distance in either direction from the crossing of 38th Street, exceeding a mile to the north of such crossing, this right of way was fenced in. Except where 38th Street and other streets crossed the line of road, the track was laid with T rails upon ties above the level of the ground in the manner customary in the construction of steam roads. Thirty-eighth Street was a paved street and where it crossed the line of railroad was built up flush with the top of the rails. The fence enclosing the right of way had openings at 38th Street but the crossing was protected by cattle guards as steam railroads usually are. At said point the defendant maintained a railroad-crossing sign bearing the words "Look out for the cars." The track was used by both the interurban cars running between Los Angeles and Long Beach and by some local cars. The car which struck Campbell was a car running for the greater part of its course over the city streets and, after leaving the streets, over the private right of way to the then city limits. It was operated as a local car stopping on signal to take and discharge passengers. At the time of the accident it was southbound.

Under these circumstances, was the point where 38th Street crossed the track one of the places at which, under a fair con-

struction of the ordinance, a speed in excess of eight miles an hour was prohibited? The ordinance makes it unlawful to operate "any street-car or any car upon any street-railway track upon or over any street crossing or intersection" at a greater speed than that specified. It will be observed that the applicability of the ordinance does not depend upon the nature of the car which is being operated. The running of any car, whether street-car, or other, is within the terms of the prohibition. But, in order to come within the ordinance, the car must be operated "upon a street-railway track upon or over any street crossing or intersection." The question, then, is whether such track as the one above described is a street-railway track. Upon a consideration of the usual meaning of the words, as well as the uniform current of authority, this question must be answered in the negative.

A street-railway is defined in the Century dictionary as "a railroad constructed upon the surface of the public street in towns or cities; a tramway"; in the Standard dictionary as "a railroad on the surface of the streets, for the convenience of passengers; a surface railroad, as in a city." Our own court in *Board of Railroad Comm'rs* v. *Market St. Ry.*, 132 Cal. 183, [64 Pac. 1067], quoting with approval the case of *Bloxham* v. *Consumers' etc. Co.*, 36 Fla. 539, [51 Am. St. Rep. 44, 18 South. 444, 29 L. R. A. 507], uses this language: "The term 'street-railroad' applies only to such roads, the rails of which are laid to conform to the grade and surface of the street, and which is otherwise constructed so that the public are not excluded from the street as a public highway, which runs at a moderate rate of speed, compared with commercial railroads, which carries no freight, but only passengers from one part of a thickly populated district to another, in a town or city and its suburbs." In *Hannah* v. *Met. St. R. Co.*, 81 Mo. App. 79, the court says: "A street-railway has been variously defined. As the name indicates, the primary meaning of street-railway, or street-railroad, is one constructed and operated on and along the streets of a city or town for the carriage of persons from one point to another in such city or town or to and from its suburbs." Similar expressions are to be found in many cases. (*Philadelphia* v. *McManes*, 175 Pa. St. 28, 33, [34 Atl. 331]; *Nichols* v. *Ann Arbor & Y. St. R. Co.*, 87 Mich. 361, [49 N. W. 538, 16 L. R. A. 371]; *Massachusetts Loan*

& Trust Co. v. Hamilton, 88 Fed. 588, [32 C. C. A. 46]; Diebold v. Traction Co., 117 Ky. 146, [111 Am. St. Rep. 230, 77 S. W. 674, 63 L. R. A. 637]; Freiday v. Sioux City etc. Co., 92 Iowa, 191, [60 N. W. 656, 26 L. R. A. 246]; Thompson etc. Elec. Co. v. Simons, 20 Or. 60, [23 Am. St. Rep. 86, 10 L. R. A. 251, 25 Pac. 147]; South & N. A. R. Co. v. Highland Ave. & B. R. Co., 119 Ala. 105, [24 South. 114].)

Whether or not a railway is a street railway does not depend on the motive power. (Nichols v. Ann Arbor & Y. S. R. Co., 87 Mich. 36, [49 N. W. 538, 16 L. R. A. 371]; McNab v. United Ry. etc. Co., 94 Md. 719, [51 Atl. 421].) Various features are to be considered. Among those are the location and method of construction of the track, the manner of the operation of the cars and the general purpose of the enterprise. Here, however, we are confronted by a somewhat narrower question. The ordinance speaks not of the operation of street-railways but of cars upon street-railway tracks. It would seem clear that in the definition of this term the location and manner of construction are most important factors. The decisions above cited, and particularly that of this court in Board of R. R. Comm'rs v. Market St. Ry. Co., 132 Cal. 683, [64 Pac. 1067], indicate that an essential element of a street-railway, in the ordinary acceptance of the phrase, is that the road should run along and upon a street or road in such manner as not to exclude the public from the use of such street or road as a public highway. Applying this test, there can be no doubt that the track of the defendant, in so far as it was laid along its private right of way in such manner as to exclude the general public from the use of any part of the strip, was not a street-railway track.

The respondent draws attention to the fact that, for the width of 38th Street the track was laid flush with the surface so that passengers and vehicles might cross on the street. It cannot be said that this part of the track was thereby converted into a street-railway track. A street-railway, as we have seen, is one running along a public street, not across one. To adopt the contention of the respondent in this regard would mean that the track of every commercial or steam railroad which, in entering the city of Los Angeles crossed any street, became to the extent of the width of such

street a street-railway track.  · This is obviously not the intent of the ordinance.

We have already expressed the opinion that, giving to the words used their ordinary meaning, the language of the ordinance requires that its applicability be made to depend upon the nature and location of the track, rather than upon the character of the particular car that is running upon the track. And, apart from any consideration of mere definition of words, we think the ordinance is given a more reasonable effect by this interpretation.  If it were to be held that for the purposes of this particular case, the track in question was a street-railroad track because the car that hit Campbell was a local or street-car, the logical result would be that a car operated as a through passenger or freight car over the same track would not be required to observe the limits of speed. It would follow, too, that such through car when running on city streets over tracks which are ordinarily classed as street-railway tracks, would be free from such limitations.  So read, the ordinance would afford very little protection to the public. The ordinance should be construed so as to require both inter-urban and local cars to be equipped with fenders and to limit their speed when running over street crossings upon those portions of the tracks which are laid upon public streets in the manner which has been described as pertaining to street railways, but to exclude them from the effect of the ordinance when they are being operated upon tracks of the character here described.

From these views it follows that the court was in error in giving the instructions above referred to.  The same reason requires the conclusion that defendant's requested instruction No. IV, to the effect that the ordinance limiting speed was not applicable, should have been given.  The appellant also urges that it was error to admit the ordinance in evidence. It may be that this ruling could be defended on the ground that the character of the track could not be definitely known until the evidence was all in.  The introduction of the ordinance in advance of proof of the character of the track would be a matter going merely to the order of proof, and would, in itself, be unimportant if on proof of the facts, as shown by this record, the court had instructed the jury that the ordinance was not to be considered.

It is contended by the respondent that the pleadings fail to raise an issue as to the applicability of the ordinance. We think this contention is based on too narrow a consideration of the averments and denials. The complaint alleges that the defendant was operating a line of street-cars upon various streets and thoroughfares of the city of Los Angeles and particularly along Long Beach Avenue in said city and past the intersection of Long Beach Avenue with 38th Street of the city of Los Angeles. It then alleges the substance of the ordinance and declares that the defendant negligently and wantonly caused its car to be run at a greater speed than eight miles an hour. The answer does not deny that the defendant was the owner of a line of street-cars operated as stated, but alleges that the car with which Campbell collided was being operated upon a private right of way of the defendant running from the city of Los Angeles to the city of Long Beach; that said line was a part of the interurban railway system and that the said street, to wit, 38th Street, crossed the said railway track at its private right of way and was not a street crossing or intersection within the meaning of the said ordinance set out in the complaint.

If it be said that the answer does not deny that the car was being operated upon a street-railway track, it is to be observed that the fact of such operation is not, in express terms, averred in the complaint. But, beyond this, the answer does clearly evidence an intent on the part of the pleader to set up facts showing the inapplicability of the ordinance and, we think, succeeds in effecting this purpose. It is not necessary, in order to raise an issue, that a denial be made in the precise words of the averment sought to be controverted. "Any averment in an answer which, if found to be true, necessarily shows that the allegation of the complaint as to the same matter, is untrue, is a good traverse, and sufficient. as a denial." (*Burris* v. *People's Ditch Co.,* 104 Cal. 248, 253, [37 Pac. 922]; *Perkins* v. *Brock,* 80 Cal. 320, [22 Pac. 194]; *Stetson* v. *Briggs,* 114 Cal. 511, [46 Pac. 603].)

The errors committed with reference to the ordinance necessitate a reversal. The case seems to have been submitted to the jury without regard to any averment of negligence other than those arising from the ordinance. Upon a new trial, the plaintiff will, of course, be entitled to offer evidence in sup-

port of each specification of negligence pleaded, including the claim that, irrespective of any legislative limitation, the defendant's car was operated at a speed in excess of that which would be permitted in the exercise of due care.

A discussion of some further points may be useful as a guide for rulings upon a new trial.

The complaint alleges, as an element of negligence, that the motorman, on approaching 38th Street, gave a signal (two whistles) as an indication that the car would stop. The answer to this allegation is not so direct as it might have been. If the point were of vital importance, we should be inclined to think the denial sufficient to raise an issue on the question whether the blowing of two whistles was intended and ordinarily understood to give notice of an intention to stop. But, since there is to be a new trial, this need not be decided. The defendant, on a proper showing, may be granted leave to amend its answer.

The question of this signal of two whistles has a double bearing. It is counted on by plaintiff as establishing negligence on the part of the defendant in failing to slow down or stop after indicating an intent so to do, and is further urged as tending to overcome the inference—otherwise perhaps irresistible under the facts shown in the record—that Campbell had been guilty of contributory negligence. We think that, if the custom or practice of so signalling were shown, it would be legitimate matter to be considered in both aspects. That failure to follow the announced signal would tend to show negligence on the part of the motorman is not disputed. And, on the issue of contributory negligence, the evidence might conceivably be such as to authorize the jury to infer that the signal constituted an invitation to approach the track in the belief that the car was about to stop at 38th Street. But these issues of negligence on the part of the defendant and of Campbell must be determined in the light of the evidence that may be introduced on a new trial. Such evidence may vary materially from that contained in the present record. There is, therefore, no occasion for us to attempt to say whether, in the trial already had, there was sufficient evidence to justify the submission to the jury of the questions whether the signal had the meaning alleged in the complaint, and whether the conduct of the decedent was free from such negligence as to bar the action.

One further suggestion may be made regarding the issue of contributory negligence. In view of what we have said in discussing the applicability of the ordinance, it seems clear that the track, at the point where Campbell undertook to cross, partook more of the nature of a steam railroad than of a street-railroad track. The language of the district court of appeal in *Heitman* v. *Pac. Elec. R. Co.*, 10 Cal. App. 397, 402, [102 Pac. 15, 17], is in point: "Without assuming to hold that in all cases and under all conditions the crossing of an interurban electric railway is to be governed by the same rules as those applied to steam railways, we, nevertheless, feel that the rule of precaution laid down in *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227, 230, [53 Pac. 651], is applicable here." Instructions XIV, XVII, XVIII, and XIX, given by the court at the request of the defendant, embodied these views, and stated them as favorably to the defendant as it has a right to demand.

This appeal was first heard by the district court of appeal for the second appellate district, which, after filing an opinion for affirmance of the order, granted a rehearing. On the rehearing, the justices were unable to agree. The original opinion considered, among other things, a point made by appellant with regard to the admission of testimony bearing on the amount of damage. We approve, and adopt that court's statement and discussion of the point, as follows:—

"The wife of the deceased was permitted, against the objection of defendant, to testify that one of the children of herself and the deceased, a little girl, was crippled in the right arm and had been under the surgeon's care for seven or eight months; and, that another little girl had a shoulder-blade turned around, that it was so from birth and that she had been doctored for a 'good many years' and was still under the doctor's care. We are of the opinion that this evidence was admissible.

"The courts have not attempted to declare any general rules to be applied in determining the evidence which may be considered by the jury in ascertaining what damages are just in an action of this kind. Even in reviewing the conclusions of the jury in view of the circumstances of the special cases under consideration (Code Civ. Proc., sec. 377) it has been found to be impracticable to designate the particular elements

of the loss for which damages may be awarded in such an action. Following the English court's declaration of the purpose of Lord Campbell's Act, after which our statute is patterned, our own supreme court has said the action under section 377 of the Code of Civil Procedure is intended 'for compensating the families of persons killed, not for the solacing of their wounded feelings.' (*Munro* v. *Dredging Co.*, 84 Cal. 515, 523, 18 Am. St. Rep. 248, 24 Pac. 303].) Of the statute of 1862, which preceded the code provision, it was said: 'The statute intends the recovery to be a humane provision for those who have lost their natural protector, through the negligence of another.' . . . 'The jury is authorized to take into consideration the pecuniary injury resulting to those who were most nearly related to the deceased, and who in the ordinary course of human affairs would probably have been the most benefited by his future labors if he had lived.' (*Taylor* v. *Western Pac. Co.*, 45 Cal. 323, 333.)

"While solace for wounded feelings may not be included in the damages awarded, the loss of society, comfort and care to a wife and children, as well as their support, may be considered in so far as they affect the question of pecuniary loss to them by the death of the husband and father. (*Beeson* v. *Green Mountain Co.*, 57 Cal. 20, 38; *Green* v. *Southern Pacific Co.*, 122 Cal. 563, [55 Pac. 577].) And so it was held proper for a trial court to instruct the jury that the value of the services of a mother to her children in their nurture and instruction, and in their moral, physical and intellectual training, might be considered in estimating the damage to them by her death, and that the value thereof was not to be determined by the value of such services as rendered by a hired servant, but should be ascertained in the light of the ability and willingness of the mother to perform such services; and also that the pecuniary interest of the children in such services did not of necessity terminate with their arrival at the age of majority. (*Redfield* v. *Oakland Co.*, 110 Cal. 277, 288, [42 Pac. 822, 1063].)

"The pecuniary loss suffered by the 'heirs' of a person killed, by reason of his death, 'may be either a loss arising from the deprivation of something to which such heirs would have been legally entitled if the person had lived, or a loss arising from a deprivation of benefits which, from all the

circumstances of the particular case, it could be reasonably expected such heirs would have received from the deceased had his life not been taken, although the obligation resting on him to bestow such benefits on them may have been a moral obligation only,' says Shaw, J., in *Sneed* v. *Marysville Gas Co.*, 149 Cal. 704, p. 710, [87 Pac. 376]. If the latter class does not include them, the benefits which might be expected from the kindly relations of the parties and the peculiar disposition of the deceased towards his family may be added to the foregoing (*Cook* v. *Clay St. Co.*, 60 Cal. 604), and as affecting these questions evidence of the ill health and invalid condition of the wife have been held to be properly admitted. (*Evarts* v. *Santa Barbara etc. Ry. Co.*, 3 Cal. App. 712, 715, [86 Pac. 830].)

"Much of this kind of evidence so admitted is open to the objection urged by appellant, and which was sustained in the cases of *Green* v. *Southern Pacific Co.*, 122 Cal. 563, [55 Pac. 577], and *Mahoney* v. *S. F. Ry. Co.*, 110 Cal. 471, [42 Pac. 968, 43 Pac. 518], to wit: that it tends to create a sympathy for, or prejudice in favor of the plaintiffs, but in those cases it was said that the testimony there under consideration could have been offered for no other purpose. · The evidence before us cannot be so limited in its effect. The testimony introduced in those cases tended to show, only, that the children of the deceased (plaintiffs) had no means of their own. Had it been shown in addition to this that the children were unable to maintain themselves by work, a different question might have arisen. (Civ. Code, sec. 206.) The obligation of support under this section is held to be cast upon the father of an invalid daughter, although over eighteen years of age, and the wife who is awarded the custody of such invalid in a divorce proceeding is entitled to an allowance for her maintenance. (*Anderson* v. *Anderson*, 124 Cal. 48, 54, [71 Am. St. Rep. 17, 56 Pac. 630, 57 Pac. 81].) Among the necessaries which a father is called upon to supply to his children none is more clearly recognized than proper medical attention. While to the well child, food, clothing, and education, according to the parent's circumstances, are sufficient, if the child be either a temporary or permanent invalid additional care may be required. Whether or not this shall constitute one of the elements of loss to the family of the deceased must be

determined by the facts of the case under consideration. If
it be urged that the ordinary support of the normal child
might be considered by the jury from their own observations,
there could be no such standard for sick or crippled children,
as the case of each must be determined by evidence as to his
or her condition. If a defendant fears the effect considered
in the Mahoney and Green cases where evidence otherwise
competent is admitted, this may be provided against by in-
structing the jury as to such evidence, in the same manner as
is done in respect to that relating to the loss of society, that
it can only be considered as an element of pecuniary loss. We
are unable to see upon what ground the evidence here under
consideration could have been excluded.

"The statutes of some of the other states from which cases
have been cited are so unlike our own that these are of little
aid. Thus the statutes of the state of Illinois made the 'wife
and next of kin' the beneficiaries in such an action, and the
damages recovered are distributed among them in the same
proportion as personal property of a deceased intestate is
distributed under the statute for distribution in estates. Fol-
lowing this it is held: 'The amount to be recovered is what
the statute regards as the pecuniary value of the addition to
such estate left as the deceased, in reasonable probability,
would have made to it, and left, if his death had not been so
wrongfully caused.' (*Chicago* v. *Woolridge,* [174 Ill. 330],
51 N. E. 701, 702.) Under such a theory of the action it is
apparent that the wage-earning and accumulating capacity
of the deceased would be the sole question of inquiry, and that
cases decided in such a jurisdiction are so out of harmony,
both with our statutes and decisions, they can be given little
weight in our consideration. It seems unnecessary to distin-
guish the cases cited by appellant from Illinois and other
states in which similar statutory provisions obtain. It has
been expressly held in this state that the wage-earning capacity
of the deceased was not the measure of damages. (*Skelton* v.
*Pacific Lumber Co.,* 140 Cal. 507, p. 512, [74 Pac. 13].) So,
also, an instruction in effect directing the jury to consider
and ascertain the losses of father and children respectively by
the death of the mother as distinct elements in the lump sum
of damages awarded, was held proper in such a case. (*John-
son* v. *Southern Pacific Co.,* [154 Cal. 285], 97 Pac. 520, 526.)

"While there can be but one action and the recovery to which all persons included in the term 'heirs' are entitled must be had therein or be deemed to be waived (*Daubert* v. *Western Meat Co.*, 139 Cal. 480, [96 Am. St. Rep. 154, 69 Pac. 297, 73 Pac. 244]), the loss of each and all must be considered. The statute does not provide for a distribution among the members of the family who take as the beneficiaries of the statute. There was such a provision in the statute of 1862, but it was not incorporated in the code, thus indicating an intention to restore the action to what it was originally intended to be, a means of providing for the family and each member thereof that which each could have expected to receive in the way of comfort and support from the lost father had he lived and kept the family together, bestowing upon each such portion of his earnings as he or she were entitled to or required. It is not intended that the amount recovered shall be divided into integral or proportional parts. The persons entitled do not take as heirs or by succession, but as beneficiaries of the statute; 'the statute being framed upon the theory that the heirs will always constitute the family of the deceased.' For this reason it was held that collateral kindred who may come technically within the meaning of the word 'heirs,' used in section 377, can only recover by alleging and showing some special damage." (*Burk* v. *Arcata*, 125 Cal. 364, [73 Am. St. Rep. 52, 57 Pac. 1065].)

The order denying a new trial is reversed.

Shaw, J., Angellotti, J., Melvin, J., and Henshaw, J., concurred.