[L. A. No. 7191. In Bank.—November 1, 1923.]

MARGARET M. BILLIG (a Minor), by Her Guardian ad Litem, HARVEY E. BILLIG, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), et al., Defendants; SOUTHERN PACIFIC COMPANY, Appellant.

IRMA E. ROBISON, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), et al., Defendants; SOUTHERN PACIFIC COMPANY, Appellant.

T. D. SAYRE, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), et al., Defendants; SOUTHERN PACIFIC COMPANY, Appellant.

[1] NEGLIGENCE — APPROACHING RAILROAD TRACK — CARE—RULE.—The rule governing the duty of a person approaching a suburban electric railroad track at a crossing is the same as that required of a person approaching or crossing the track of a steam railway.

[2] ID.—DUTY TO STOP, LOOK AND LISTEN—YIELDING RIGHT OF WAY. It is the duty of a person approaching the crossing of a suburban railroad being operated outside the limits of cities, whether the same are steam or electric railroads or are railroads upon which motor-cars propelled by gasoline are being used, to stop and look and listen for such approaching trains or cars and to yield the right of way to such trains or cars.

[3] ID.—RIGHTS AND DUTIES OF MOTORMAN—PRESUMPTIONS.—The engineer or motorman in charge of a train or car of a suburban railroad approaching a highway at its intersection with the railroad track has the right to presume that a person on the highway approaching the crossing will perform the duty which the law imposes upon him, and in the reasonable exercise of his faculties of observation and caution will not essay such crossing until the danger due to the approaching train or car has passed; and the operator of such train or car is not bound to check the otherwise rightful speed of the train or car in approaching and passing such crossing until at least he has reason to believe that such person so approaching the crossing is not performing, or is not likely to perform, his duty in the foregoing regard.

2. Duty to look and listen before crossing tracks of interurban road, notes, 23 L. R. A. (N. S.) 1224; 1 A. L. R. 203.

Duty of driver of automobile to stop, look and listen before crossing railway track, notes, Ann. Cas. 1913B, 682; Ann. Cas. 1915B, 678.

[4] Id.—Insufficiency of Evidence.—It is held that the evidence does not show actionable negligence on the part of the appellant in this action for damages for personal injuries to passengers on a suburban motor-car, resulting from a collision between it and a motor-truck passing along a highway intersecting the railroad track.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Reversed.

The facts are stated in the opinion of the court.

W. I. Gilbert and Devlin & Devlin for Appellant.

E. B. Drake for Respondents.

RICHARDS, J., *pro tem.*—These three actions, commenced separately, were by stipulation of the respective parties tried together and, while separately appealed, have been also, by stipulation, presented for our review upon one transcript and a single set of briefs. Each of said actions was commenced for the recovery of damages from the defendants, who were the same in each case, for injuries arising out of a collision between an interurban gasoline motor-car of the defendant Southern Pacific Company and a motor-truck owned by the defendant Wm. C. Harris, and being operated by the employee of said defendant Harris and being used at the time of said collision by the operator thereof in the transportation of a truck and trailer load of gasoline upon a public highway intersecting at the point of the collision the tracks of the Southern Pacific Company, upon and along which its said motor-car was being propelled by the latter's agents and employees. The plaintiffs in each case were passengers upon said motor-car. Upon the trial of these consolidated cases before a single jury the plaintiffs respectively recovered the following verdicts against the defendant Southern Pacific Company and Wm. C. Harris, viz.: Margaret M. Billig, $15,000; Irma E. Robison, $20,000; T. D. Sayre, $10,000; which verdicts, with costs, ripened into judgments in favor of said plaintiffs respectively. An appeal was taken by the defendant Wm. C. Harris from each of said judgments, but upon said appeal said judgments were affirmed. (*Billig et al.* v. *Harris et al.,*

189 Cal. 476 [209 Pac. 241].) The questions presented and decided upon said appeal are not, however, germane to the instant appeal. The Southern Pacific Company also appealed to this court from each of said judgments and the same were thereafter transferred to the district court of appeal for the second appellate district, division one, for hearing and determination, wherein said judgments were affirmed, whereupon the said appeals were, upon petition of the said appellant, transferred to this court for final hearing and determination.

The essential facts presented by this single record upon these appeals are substantially without conflict or contradiction. The railroad track of the Southern Pacific Company, along the line of which this collision occurred, runs from Los Angeles to Long Beach, passing several smaller towns or stopping places along its route and crossing at various angles a number of public highways or thoroughfares in its course. Among these is Long Beach Boulevard, which is a much-traveled thoroughfare between Los Angeles and Long Beach. The route of said railroad line lies during much of its distance between these two cities outside the city limits of either and said railroad line for a considerable distance on each side of the place where said collision occurred is not within the limits of either city. The motor-car which the Southern Pacific Company was operating along said railroad line at the time and place of said collision and upon which the plaintiffs were passengers was of the type usually known and described as an interurban car, being approximately 70 feet in length, 8 feet wide, weighing about 70,000 pounds, being operated by a gasoline motor built into the car and of approximately 200 horse-power, the car, including its headlight, being lighted with acetylene gas light, the headlight being at the top and in front of the car and being of 250 candle-power. The car was equipped with automatic air-brakes of a modern and approved pattern and was controlled and operated by an engineer who, with the controlling appliances, occupied the forward end of the car, having a full view of the region ahead of the advancing car. The car was also equipped with a bell of the type, in point of size and resonance, similar to those in common use upon the engines of steam railroad trains. It was neither shown nor contended that the car or its appliances or the track

upon which it was being operated at the time and place of this collision was defective in any way contributing to the accident out of which the plaintiffs' injuries arose. The Long Beach Boulevard and the private right of way upon which the tracks of the appellant were located intersect at the point of the collision at an angle which is slightly acute but is such an angle that a lighted car or train approaching the intersection from the direction of Los Angeles can be plainly seen by the drivers of vehicles upon said boulevard for a distance of at least six or seven hundred feet along said track from the point of intersection, the region immediately surrounding said point of intersection, being practically open country, affording an unobstructed view to both operators of cars upon the track and operators of vehicles approaching its intersection with the boulevard. At this point of intersection there are railroad crossing signs warning travelers upon the boulevard to stop and look and listen and there is also an electrically operated wig-wag signal consisting of a large disc with a red light in the center, which oscillates from side to side, ringing a bell, beginning when approaching cars or trains are about 1500 feet distant from the intersection and continuing until the car or train has gone some distance past it. On the evening of January 19, 1921, at about 5:44 o'clock, the aforesaid car of the Southern Pacific Company, which had left Los Angeles at 5:20 P. M. of that day with a carload of passengers, including these plaintiffs, approached this intersection. It was running on its official schedule time and was proceeding at a rate of speed which was variously estimated by observers at from 25 to 40 miles an hour. It is not contended that either of these estimated rates of speed or any other rate between them at which said car might have been actually traveling would be inherently dangerous to passengers on the car in the absence of an intersecting roadway or of any obstruction to the passage of the car over the same. It was not therefore negligence in those operating said car to have propelled the same at either rate of speed unless the presence of the intersecting roadway or the possibility or actuality of obstructions thereon rendered it so. As to the defendant Wm. C. Harris the evidence showed that he was doing business under the name of Harris Bros. Truck Co. and under that name was the owner of an autotruck with trailer,

which combined vehicle was being driven along and upon
Long Beach boulevard on the way to Long Beach just prior
to and at the time of said collision by an employee of said
Harris. This autotruck is described as weighing approxi-
mately 5 tons and being with its trailer about 44 feet in
length. It was equipped with headlights and was engaged
at the time in carrying a truck and trailer load of gasoline
toward Long Beach and was traveling at a rate of speed
variously estimated to somewhere between 6 to 18 miles an
hour and according to the testimony of its driver was sus-
ceptible of being stopped within 20 feet while going at the
speed it was traveling at the time. It was not stopped or
halted, however, but was driven up to the intersection and
on to the railroad track immediately in the path of the ad-
vancing car, thus causing the collision wherefrom the plain-
tiffs' injuries resulted.

The driver of the truck undertakes to testify that as he
approached the crossing he looked up the track and did not
see the lights of the approaching car. He also testifies that
he looked up at the wig-wag signal when he was 6 feet
from the crossing and saw it begin to move, its light come
on, and heard its bell begin to ring. With respect to the
lights of the car this witness is positively contradicted by
the testimony of the plaintiffs themselves who testified that
the lights of the interior of the car at least were so bril-
liantly lighted as to enable them and other passengers to
read thereby; while every other witness in the case except
the driver of the truck who saw the approaching car testi-
fied that its headlight was lit and its interior lights plainly
visible. He therefore must have seen them if he had looked
up the track as he testified he did; while as to the wig-wag
the undisputed evidence in the case shows that it is located
9 or 10 feet from the east side of the track and hence
that the truck driver would be past it and practically upon
the track when he says he first saw it begin to move and
its light come on; and he nowhere states that he observed
it at all until he had reached that point. Read as a whole
his testimony as to whether the wig-wag was moving and
was lighted with its bell ringing as he approached the cross-
ing is negative and amounts to no more than that he saw
the wig-wag for the first time when within 6 feet of the
crossing and that its movements within his vision began at

that time. The evidence of every other witness who was in a position to see the wig-wag prior to the collision is positive to the effect that it was moving with its light visible and its bell ringing before the truck had reached a point where it could not have been easily halted in time to have avoided the collision. The inference is irresistible that the driver of the truck was for some reason neither looking nor listening as he approached this crossing, since had he been so doing he must have observed the visible signs and various signals of the oncoming car.

[1] Before proceeding further to a consideration of the facts and circumstances which immediately preceded and attended said collision, it will be in proper sequence to determine and declare the law governing the rights and duties of those persons who were engaged in the operation of the motor-car and of the autotruck at the place and at and immediately preceding the time of said collision. In the recent case of *New York Lubricating Oil Co.* v. *United Railroads,* 191 Cal. 96 [215 Pac. 72], it was declared that the rule governing the duty of a person approaching a suburban electric railroad track at a crossing was the same as that required of a person approaching or crossing the tracks of a steam railway, citing *Martz* v. *Pacific Electric Ry. Co.,* 31 Cal. App. 592 [161 Pac. 16]; *Heitman* v. *Pacific Electric Ry. Co.,* 10 Cal. App. 397 [102 Pac. 15]; *Simoneau* v. *Pacific Electric Ry. Co.,* 159 Cal. 494 [15 Pac. 320]; *Phillips* v. *Washington Elec. Ry. Co.,* 104 Md. 455 [10 Ann. Cas. 334, 65 Atl. 422]. [2] In the foregoing cases and in others yet to be cited the rule is that it is the duty of a person approaching the crossing of a suburban railroad being operated outside of the limits of cities, whether the same are steam or electric railroads or are railroads upon which motor-cars propelled by gasoline are being used, to stop and look and listen for such approaching trains or cars and to yield the right of way to such trains or cars. (*Green* v. *Southern Cal. Ry. Co.,* 138 Cal. 1 [70 Pac. 926]; *Murray* v. *Southern Pac. Co.,* 177 Cal. 1 [169 Pac. 675]; *Herbert* v. *Southern Pac. Co.,* 121 Cal. 227 [53 Pac. 651]; *Griffin* v. *San Pedro Elec. Co.,* 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282]; *Thompson* v. *Southern Pac. Co.,* 31 Cal. App. 567 [161 Pac. 21]; *Basham* v. *Southern Pac. Co.,* 176 Cal. 320 [168 Pac. 359]; *Simoneau* v. *Pacific Elec. Co.,*

159 Cal. 494 [15 Pac. 320] ; *Loftus* v. *Pacific Elec. Ry. Co.,* 166 Cal. 464 [137 Pac. 34] ; *Heitman* v. *Pacific Elec. Ry. Co.,* 10 Cal. App. 397 [102 Pac. 15] ; *Baker* v. *Southern Pac. Co.,* 184 Cal. 357 [93 Pac. 765] ; *Young* v. *Southern Pac. Co.,* 189 Cal. 746 [210 Pac. 259, 262].) In the case last above cited the court in applying the foregoing rule to the facts of that case said: "The law presumes that a person possessing normal faculties of sight and hearing must have seen and heard that which was within the range of his sight and hearing. Absent-mindedness or foregtfulness will not suffice as an excuse for the neglect of a person about to cross a railroad track to look and listen for a possible approaching train. And a person who attempts, regardless of warnings, to cross in front of a moving train, even though he be apparently in a condition of mental abstraction and consequently indifferent to the peril of his situation, is nevertheless negligent"; and upon a former appeal of the same case this court, upon the same facts, held that such a person would be negligent as a matter of law. (*Young* v. *Southern Pac. Co.,* 182 Cal. 337, 338 [190 Pac. 36].)

[3] Turning from the right and duty of persons approaching upon a highway at its intersection with a suburban railroad to the right and duty of the engineer or motorman in charge of such suburban train or car in approaching such intersection, this court has held in numerous and uniform cases that such engineer and motorman has the right to presume that a person thus approaching the crossing of a suburban railway will perform the duty which the law imposes upon him under the foregoing authorities, and in the reasonable exercise of his faculties of observation and caution will not essay such crossing until the danger due to the approaching train or car has passed, and it has accordingly been held that the operator of such train or car was not bound to check the otherwise rightful speed of his train or car in approaching and passing such cro̅ ̅ng until at least he has reason to believe that such person so approaching such crossing is not performing, or is not likely to perform, his duty in the foregoing regard. In the case of *Basham* v. *Southern Pac. Co.,* 176 Cal. 320 [168 Pac. 359], the rule is thus stated: "When a person is approaching a place of danger and all of the warnings of the danger have been given that reasonable care requires, those in

charge of the dangerous engine, seeing him thus acting are not obliged to presume, and it cannot be said that they act unreasonably in not presuming, that the person will continue his approach until he gets into the very place of danger, when it is obvious that he could with the least care stop and avoid it.''

Having in view the foregoing principles, let us return to the consideration of the facts and circumstances of this case immediately preceding and attending this collision. The interurban gasoline motor-car of the defendant Southern Pacific Company in charge of an experienced motorman or engineer was at the hour of 5:44 of the day in question proceeding upon its regular evening trip between Los Angeles and Long Beach. It was mechanically in perfect order, having been officially inspected an hour or two before the trip began and found to be so. It was running on schedule time and was proceeding at the variously estimated speed of from 25 to 40 miles per hour at the time it approached the intersection of the railroad track upon which it was running with Long Beach Boulevard. At said time of the day and year the sun had set some half hour before and twilight was coming on. The lights within the car were lighted and according to the testimony of the plaintiffs themselves, who were among its passengers, were sufficiently brilliant to read by easily, and according to the testimony of outsiders going or living along said boulevard, were plainly visible. The headlight upon the car was lighted and shed a radiating light ahead along the track and upon each side of it for several hundred feet and was such a light as must have been seen by any persons approaching the crossing along the boulevard and exercising their ordinary faculties for observation. The car was equipped with a bell of the type used upon ordinary locomotives and which was being kept ringing as the car proceeded on its way. It was also equipped with air-brakes of an approved type capable of stopping the car within a reasonable distance, depending upon its speed and load. At the crossing there were the usual warning signs warning passers-by against the danger of approaching trains and there was also installed there an electrically operated wig-wag signal of approved design, equipped with a red light and bell, and which automatically began to oscillate and ring when an approaching car reached

a point upon the railroad track approximately 1,500 feet from the crossing and which continued its motion until the car had passed by. These visible precautions at the crossing were known to the engineer in charge of the car to exist. When the car reached a point about 150 feet from the crossing the engineer observed the motor-truck and trailer of the defendant Harris proceeding along the boulevard and approaching the crossing at a speed which the engineer estimated to be about 15 or 18 miles an hour, but which the driver of the truck stated was about 11 miles an hour, diminishing as the truck neared the crossing. At the time the engineer first observed the truck it was lighted, was in charge of a driver, and was to all appearances under control. According to the testimony of the driver the truck could be stopped within 20 feet, and there is nothing to indicate to the contrary so as to put the engineer upon notice that the truck could not be brought to a standstill within some such distance. The engineer states that as soon as he observed the oncoming truck he gave four blasts on the whistle with which his car was equipped, two long and two short blasts, which are the standard danger signals of railroads at crossings and there is ample evidence from outside witnesses to show that said signals were given. The engineer further testifies that he first observed that the driver of the truck did not intend to stop when his car was within 50 feet of the crossing and that he at once used every means within his power to bring the motor-car to a stop so as to prevent the collision, but that it was impossible to do so within that distance and within a second or two thereafter the collision occurred. The practically undisputed evidence in the case shows that a motor-car of the size and weight of this one, when proceeding at the rate of 25 miles an hour, cannot be brought to a stop within a distance of less than 100 feet under the most favorable conditions. The expert called by the plaintiffs themselves so testified, and if this car was, according to the testimony of certain of the plaintiffs' witnesses, traveling at a rate approximating 35 or 40 miles an hour it could not have been stopped within a distance of less than from 175 to 350 feet.

[4] Applying the principles of law hereinbefore set forth to the facts of this case as above recited, the conclusion is irresistible that actionable negligence on the part of the

Southern Pacific Company, appellant herein, has not been shown. There is not a scintilla of evidence in the case to show that the engineer of the appellant's motor-car observed the motor-truck upon the boulevard approaching the crossing when the car was farther away from the crossing than 150 feet, but even if there had been such evidence the situation would not be changed, since the engineer at whatever point he was along said track when he first observed or could have observed the approach of the motor-truck toward the crossing was entitled to proceed at the speed his car was going in reliance upon the presumption that the driver of the motor-truck would make use of the ordinary facilities for observation of a reasonable man and would stop his vehicle before the crossing was reached. There is no sufficient evidence to show that there was anything in the size, position, control, or movement of the motor-truck when the engineer first observed it to indicate that it was not approaching under perfect control or that it would not, or could not, be halted before the crossing was reached, nor is there any basis in the record before us for either the assumption or the argument that the engineer, at whatever point he was when he first observed or could have observed the motor-truck could or should have suspected or realized that it was proceeding or would continue to proceed without stopping, to the crossing, regardless of the visible presence of the approaching car or of its danger signals by bell and whistle and of the several warning signals at the crossing, which, according to the undisputed evidence, were functioning within the direct line of vision of the driver of the truck. The testimony of the engineer, given upon the trial of the cause, that his first realization that the motor-truck was not to stop before the crossing was reached by it came when his car was within 50 feet of the crossing is supported by every inference and intendment in the case. The respondents, however, contend that there is sufficient evidence to support the conclusion that the motorman discovered the proximity of the truck to the railroad track when he was 150 feet from the point of collision and when the truck was 100 feet from the point of collision; that he then saw and knew that the truck could not be stopped before coming upon the tracks and that the evidence disclosed that at the speed he was operating he could have come to a

standstill by the application of the emergency brake within 100 feet and thus 50 feet short of the point of contact. The argument is that under these circumstances he was guilty of negligence for which the company was responsible. At the coroner's inquest this witness testified as follows: "Q. How far back did you start to use the brakes? A. Well, I immediately applied the brakes when I seen him coming so fast. I had figured he could not stop, and I applied the brakes. Q. That would be when you saw him about 100 feet away? A. Yes, sir." At the trial his attention was called to this testimony and he was questioned as follows: "Q. Were these words you spoke at that time the truth? A. Yes, sir." From this testimony it is argued that the jury would have been justified in finding that the motorman knew that the autotruck could not stop when he first saw it 100 feet away from the track. The difficulty with the contention advanced by the respondents is that the testimony of the motorman as to the relative locations of the motor-car and the motor-truck were mere estimates. It would be absurd to give full weight to these estimates as to the positions of objects changing their relative locations between 50 and 100 feet a second, and to ignore all the other testimony of the witness in connection with such estimates. At the coroner's inquest he testified that the moment he made up his mind that the truck could not stop he applied his brakes. If other testimony justified the conclusion that he could stop in 100 feet when he was traveling 25 miles per hour, and if he applied his brakes as he testified he did at the moment he saw that the truck could not stop, then it is clear either that he was going at a higher rate of speed than 25 miles per hour or that the motor-car could not be stopped in 100 feet at that speed, or that the car was nearer to the point of collision than the witness then stated. The truck, if it was going at the speed estimated of 18 miles an hour, would cover the distance of 50 feet in less than two seconds. Upon the trial the motorman estimated the distance of the autotruck from the track at the time he made up his mind it would not stop, at 50 feet and his own distance at 80 feet from the point of collision, and under all the evidence it is clear that the motor-car could not be stopped in the intervening distance of 80 feet. There is still another reason for concluding that the testimony of the

motorman as to the point where he made up his mind that the truck could not stop, when testifying before the coroner's inquest, was an inadvertence, if such testimony be construed as meaning that he so made up his mind when the truck was 100 feet from the track, and that is because the autotruck could be stopped in 20 feet. Hence he could not have known that the autotruck could not stop before reaching the track when it was 100 feet from the track, because as a matter of fact it could stop in 20 feet. It is not at all clear that the motorman intended to testify at the trial that he determined that the truck could not stop when the truck was at a distance of 100 feet from the track, when he said his testimony before the coroner's inquest was true, for such a statement was inconsistent with his whole testimony and he evidently did not notice any inconsistency. It is true that what he said was susceptible of this interpretation, but taken in connection with all his testimony at the trial, and such portions of it at the coroner's inquest as were called to his attention upon the trial, the jury would not have been justified in inferring that the motorman knew when the truck was 100 feet away from the track that it could not stop. If the verdict is based upon that finding, it is not supported by the evidence. It follows irresistibly that no precaution which the engineer of this car was legally or reasonably bound to take, and no action which was actually or reasonably within his power or duty, could have avoided this collision. The only theory upon which the appellant herein could, under the facts of this case, be held to be guilty of negligence and hence legally responsible to these plaintiffs for their injuries caused through this collision is that advanced by the respondents herein as to the law governing this case which, as presented in their briefs, is that "the operator of a rail-road train, while carrying passengers for hire when approaching a much used public highway where a vehicle is seen approaching the railroad crossing such highway has no right to presume that such vehicle will stop or not attempt to make the crossing ahead of his moving car." In support of this theory as to the law of this case the respondents chiefly rely upon the cases of *Bilton* v. *Southern Pac. Co.*, 148 Cal. 443 [83 Pac. 440], *Tousley* v. *Pacific Ry. Co.*, 166 Cal. 457 [137 Pac. 31], and *Forsythe* v. *Los Angeles Ry. Co.*, 149 Cal. 569 [87 Pac. 24]. The rule laid down in these

cases, however, has no application to the operation of steam or motor railroads outside of cities and engaged in interurban operation.   This is clearly pointed out in the authorities, hereinbefore referred to, distinguishing these latter cases and stating the correct rule applicable to the operation of interurban railroads.   To give application of the rule for which the respondents contend to steam or motor railroads engaged in interurban travel operating outside of cities would be to render practically impossible our modern and up-to-date methods of rapid transit between towns and cities.

The appellant herein urges certain other contentions relating to alleged errors of the trial court in the giving of certain instructions relative to the application of the doctrine of *res ipsa loquitur* to the case as presented to the jury, but in view of our conclusions as to the main features of these cases we do not deem it necessary to deal with these contentions.

The judgments are reversed.

Lennon, J., Waste, J., Lawlor, J., Seawell, J., Kerrigan, J., and Wilbur, C. J., concurred.

Rehearing denied.

All the Justices concurred.